**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MINNESOTA**

| | |
|---|---|
| Christopher Butler, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>U.S. BANCORP,<br><br>Defendant. | Case No. 0:24-cv-03700<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Christopher Butler, ("Plaintiff"), on behalf of himself and all other similarly situated ("Class Members"), brings this case against U.S. Bancorp ("U.S. Bank" or "Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## INTRODUCTION

1. This is a class action lawsuit against U.S. Bancorp for its unlawful disclosure of Plaintiff's personally identifiable financial information ("PIFI") to a third party, Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta" or "Facebook").

2. U.S. Bank is a major financial services provider that offers retail, business, wealth management, payment, commercial and corporate, and investment services to customers across the country and around the world.

3. U.S. Bank's online banking website— www.usbank.com —allows consumers to access their account information.

4. U.S. Bank monitors and records its customers' interaction with its website while they are logged on to access their confidential account information.

5. U.S. Bank shares customer interactions through its website with Meta, which owns, among other platforms, the social networking website and app Facebook.

6. U.S. Bank discloses this information to Facebook using the Meta Pixel ("Pixel"), a snippet of programming code U.S. Bank chose to install on its website that sends information about its users to Facebook.

7. In this case, the information shared with Meta includes "onboarding information": information obtained by U.S. Bank when a website user begins or completes applying for one of its financial products.

8. Onboarding information is collected by U.S. Bank and sent to Meta for the following products offered by U.S. Bank:[1]

a. Credit Card applications;

b. Money Market accounts;

c. LGBTQ+ Family Planning Loans;

d. Loans and credit lines;

e. Debt Consolidation;

f. Home Repair Financing;

g. Private Seller Vehicle Loans; and

h. Vehicle loans.

9. Meta utilizes a combination of the personal information obtained from U.S. Bank's website about each consumer and other information gathered from different sources for marketing and advertising purposes.

10. Under the Gramm–Leach–Bliley Act ("GLB Act"), 15 U.S.C. §§ 6801, et seq., financial institutions, such as U.S. Bank, are prohibited from disclosing a consumer's "personally identifiable financial information" without advance notification and opt-out rights.

11. The GLB Act defines "personally identifiable financial information" to include, among other things, (a) any information a consumer provides to a financial institution to obtain financial products or services (b) any information about a consumer resulting from any transaction

[1] This information is referred to herein as "personally identifiable financial information" ("PIFI") as that term is defined by the Graham-Leach-Bliley Act, 15 U.S.C. §§ 6801, *et seq.*

involving a financial product or service; or (c) any information a financial institution otherwise obtains about a customer in connection with providing a financial product or service. The examples of "personally identifiable financial information" included in the GLB Act are indistinguishable from the types of information U.S. Bank disclosed to Meta, including, among other things: (a)"[t]he fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution]"; (b) "[a]ny information that a consumer provides to [a financial institution] or that [a financial institution] or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account; and (c) "any information [a financial institution] collect[s] through an Internet 'cookie'(an information collecting device from a web server)."

12. U.S. Bank's practice of disclosing its customers' personal financial information to Meta violated Plaintiff's and other Class Members' privacy rights under the GLB Act. U.S. Bank's conduct also violated other related federal and state laws. Plaintiff brings this action, individually and on behalf of all others similarly situated, for damages and equitable relief.

## THE PARTIES

13. Plaintiff Christopher Butler resides in California. Plaintiff is a user of U.S. Bank's website and has used U.S. Bank' website on the same browsers and devices that he logs into Facebook with, where he has an account.

14. Defendant U.S. Bank is a Minnesota corporation with its principal place of business at 800 Nicollet Mall, Minneapolis, MN 55402. Defendant operates a website which allows consumers to access their account information through which it collects and retains the PII of its consumers, and discloses their PII to third party, Facebook.

## JURISDICTION AND VENUE

15. This Court has original subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

16. The Court also has original subject matter jurisdiction over this putative class action pursuant to the Class Action Fairness Act of 2005, under 28 U.S.C. § 1332(d), because: Plaintiff

is a citizen of Minnesota and Defendant is a citizen of Delaware, headquartered in Minnesota, and governed by the laws of Delaware; the matter in controversy is well in excess of $5,000,000 in the aggregate, exclusive of interest and costs; and "the number of members of all proposed plaintiff classes in the aggregate" is greater than 100, *see* 28 U.S.C. § 1332(d)(5)(B).

17. The Court has personal jurisdiction over Defendant has its principal place of business is in Minnesota and it resides there, making it subject to claims arising under general jurisdiction in Minnesota, and the acts and omissions giving rise to Plaintiff's claims arose out of Defendant's operations in Minnesota.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, and Defendant resides in this District.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I. U.S. Bank' Disclosure of the PII of Plaintiff and the Class Members to Facebook

#### A. U.S. Bank Discloses Digital Consumers' PII to Facebook

19. U.S. Bank operates a website in the U.S., accessible from a desktop or mobile device at www.usbank.com or from a handful of applications and devices, such as the U.S. Bank Mobile App, through which consumers can access U.S. Bank account information (collectively, the "Website").

20. The Meta Pixel is a unique string of code businesses can embed on their websites, allowing them to track consumers' actions and report the actions back to Facebook.

21. The Meta Pixel embedded on Defendant's website tracked user activity in real time, capturing data such as the specific pages visited, details entered into financial product applications, and other actions taken during user sessions.

22. The Pixel can follow a consumer to different websites and across the Internet even after clearing browser history.

23. This data was transmitted directly to Meta/Facebook servers, where it was processed and linked to individual user profiles through cookies and other tracking identifiers.

24. The Pixel allows Meta to build detailed profiles about a website's users as those users browse the web in order to serve targeted advertisements to those users.

25. Businesses have the option of installing the Meta Pixel on their websites. Doing so enables the business to collect information about how users interact with the business's website, such as whether they initiate purchases on the website, what items they spend time viewing, and, as relevant here, the video content the users request or obtain on a particular webpage.

26. To take advantage of advertising and information services offered by Meta, U.S. Bank deliberately integrated the Meta Pixel into the U.S. Bank website and its associated servers.

27. The Meta Pixel intercepted communications made between Plaintiffs and the Class and U.S. Bank and shared those communications with third parties, including Meta.

28. Furthermore, the transmitted data allowed Meta/Facebook to build profiles of users based on their financial activities and interactions on Defendant's website, enabling targeted advertising campaigns unrelated to Defendant's financial services.

29. When a U.S. Bank consumer requests, obtains, or shares information on U.S. Bank's website, the Pixel installed by U.S. Bank sends Facebook certain information about the consumer.

30. With regard to U.S. Bank customer identities, U.S. Bank transmits to Meta via the Meta Pixel information captured by multiple cookies that identify individual U.S. Bank customers. The key cookies involved are:

a. The "c_user" cookie: This cookie contains an unencrypted Facebook ID, which is a unique and persistent numerical identifier - similar to a social security or driver's license number - that Meta assigns to each Facebook user. This ID allows: (a) Meta to directly identify the specific individual associated with the Facebook ID; and (b) anyone to identify the specific individual by appending the Facebook ID to https://facebook.com/[Facebook ID]. The data sent to Meta by U.S. Bank included these unencrypted Facebook IDs of U.S. Bank customers

using the U.S. Bank website;

b. The “fr” cookie: This cookie contains an encrypted Facebook ID and browser identifier. While encrypted, this information still allows Meta to link the browsing session to a specific Facebook user; and

c. The “Datr” cookie: This cookie contains a unique browser identifier. While it doesn't directly contain a Facebook ID, it allows Meta to recognize the same browser across multiple visits and sessions, which can be correlated with other data to identify specific users.

31. In addition to these cookies, U.S. Bank also disclosed to Meta other data (including information identifying the customer's web browser, IP address, and browsing behavior on U.S. Bank's site) that Meta can use in combination with the cookie data to determine the identity of the individual U.S. Bank customer accessing the U.S. Bank website.

32. The combination of these cookies and additional data allows Meta to directly link U.S. Bank website activity to specific, identified individuals, thereby revealing their identity and directly relating financial information to them. This level of identification goes beyond mere anonymous tracking and constitutes a disclosure of personally identifiable financial information.

33. U.S. Bank could easily program its website so that this information is not disclosed to Facebook.

34. At all relevant times, U.S. Bank knew that the Meta Pixel disclosed PII to Meta, identifying its consumers. This is evidenced from, among other things, the functionality of the Pixel, including that the Pixel’s sharing of information with Facebook enabled U.S. Bank’s website to show targeted advertising to its digital consumers based on the products those digital consumers had requested or obtained on the website.

**B. The Information Transmitted to Meta from U.S. Bank**

35. By installing the Meta Pixel on its website, U.S. Bank is able to transmit certain

information directly to Meta.

36. Plaintiff and Class Members provided their financial information to Defendant under the reasonable expectation that it would remain private and be used solely for Defendant's financial services.

37. This information is largely derived from "onboarding" information; this is information an account holder or even a prospective account holder or consumer of U.S. Bank would input into U.S. Bank's website to receive financial products.

38. Use of the Meta Pixel Helper, an application available to Google Chrome browser uses, can be used to determine which elements on U.S. Bank's website trigger the sending of that information to Meta.

39. Using the Meta Pixel Helper, the particular financial products for which information provided by consumer during the "onboarding" process is transmitted to Meta are shown to be the following:

a. Credit Card applications;

b. Money Market accounts;

c. LGBTQ+ Family planning loans;

d. Loans and credit lines;

e. Debt Consolidation;

f. Home Repair Financing;

g. Private Seller Vehicle Loans; and

h. Vehicle Loans.

**C. Both U.S. Bank and Meta Profit Off the Meta Pixel**

40. The information Meta collects from the Meta Pixel is valuable to both Meta and U.S. Bank.

41. Meta uses this information to enhance its advertising services, improve user profiling, and develop new products; specifically, Meta uses the data to:

a. Promote safety and security on Meta products;

b. Conduct research and development to improve Meta products;

c. Create custom audience sets that can be shared with other advertisers;

d. Use the event data for ad delivery after aggregating it with other data;

e. Help websites like U.S. Bank reach people with transactional and commercial messages on Facebook Messenger and other Meta products; and

f. Personalize features and content (including ads) shown to people on and off Meta products.

42. For U.S. Bank., the Meta Pixel enables more effective targeted advertising, provides valuable customer insights, and allows for better measurement of marketing campaign effectiveness.

43. This data sharing arrangement benefits both companies financially by increasing ad revenue and customer acquisition, while compromising consumers' privacy rights.

## II. The Information U.S. Bank Shared Is Protected Under the Gramm-Leach-Bliley Act & Related Regulations.

44. The GLB Act defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

45. U.S. Bank is a financial institution, as that term is defined by Section 509(3)(A) of the GLBA, 15 U.S.C. § 6809(3)(A), and thus is subject to the GLB Act.

46. Pursuant to the GLB Act, "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

47. Pursuant to the regulations implementing the GLB Act:

a. "[n]on public personal information" means (i) "[p]ersonally identifiable financial information", and (ii) "[a]ny list, description, or other groupings of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not

publicly available", 16 C.F.R. § 313.3(n); 12 CFR § 1016.3(p);

b. "personally identifiable financial information," in turn, means "any information: (i) [a] consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution], (ii) [a]bout a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer, or (iii) [a financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer," 16 C.F.R. § 313.3(o)(1); 12 CFR § 1016.3(q)(1); and

c. specifically enumerated "examples" of types of information that qualifies as "personally identifiable financial information" include, among other things:

i. "[t]he fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution,"

ii. "[a]ny information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [a financial institution's] consumer,"

iii. [a]ny information that a consumer provides to [a financial institution] or that [a financial institution] or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account," and

iv. "[a]ny information [a financial institution] collect[s] through an Internet 'cookie' (an information collecting device from a web server)," 16 C.F.R. § 313.3(o)(2); 12 CFR § 1016.3(q)(2).

48. The information that U.S. Bank disclosed to Meta via the Facebook Tracking Pixel, including their website activity as it pertains to the above products and the onboarding conducted

therein and any information submitted in furtherance of that onboarding, considered is "nonpublic personal information" under the GLB Act and related regulations.

**III. U.S. Bank's Disclosure of Plaintiff's Non-Public Personal Information Was Unlawful.**

49. Pursuant to the regulations implementing the GLB Act, financial institutions may not, directly or through an affiliate, disclose any "non-public personal information" about a consumer to a non-affiliated third party unless, among other things: (a) the financial institution provides the consumer with a clear and conspicuous notice that accurately reflects the financial institution's privacy policies and practices; and (b) the consumer does not opt out of those data sharing practices and clear, conspicuous and accurate disclosure. 16 C.F.R. § 313.10(a)(1); 12 C.F.R. § 1016.10(a)(1).

50. As noted above, the notice to consumers regarding the financial institution's privacy policies and practices must be "clear and conspicuous" and "accurately reflect[]" the financial institution's privacy policies and practices. 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. The notice must include specified elements, including the categories of non-public personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for non-public personal information 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. The notice must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9.

51. U.S. Bank fails to provide the required "clear and conspicuous" notice that "accurately reflects" its privacy policies and practices.

52. In fact, U.S. Bank's notice to consumers regarding its data sharing states critically that "The Services [referring the U.S. Bank's mobile applications, its website, and "Application

we have placed on third party sites such as Facebook®, Twitter ®, and other social media services"] do not use cookies that capture unencrypted personal information about you."

53. This is demonstrably false, as use of the Meta Pixel Helper evidences a direct tie between a user's Facebook account and information collected from U.S. Bank's website in an unencrypted fashion.

54. U.S. Bank goes on in its privacy policy to state:

> Occasionally, you may encounter banner advertisements for our products and services on third-party websites and mobile applications. We use third-party service providers to distribute our advertisements on websites and mobile applications where we have paid to advertise. These advertisements may use tracking technologies to capture information such as IP address, browser type and usage information in order to track the effectiveness of our advertising efforts. We may associate the information collective by these technologies with your identity. Our advertising service providers are prohibited from using any information collected except to track advertising effectiveness.[2]

55. Moreover, U.S. Bank states:

> In addition, we use advertising service providers to place advertisements for our accounts and services on websites not affiliated with us, and to help us determine which of our advertisements are most likely to be of interest to you using non-personal behavioral information. Advertisements placed by these service providers may use tracking technologies that allow monitoring of your responsiveness to such advertisements. We restrict access and collection of information by advertising service providers for purposes other than assisting us with our advertising efforts.[3]

56. However, U.S. Bank's disclaimers are hardly clear and conspicuous, and does not explain what it means by "track[ing] advertising effectiveness" or by "restrict access and collection of information."

57. The use of the Meta pixel is considered sharing information with Meta (a non-affiliate) for marketing purposes. Within the meaning of the GLB Act and related regulations,

[2] https://www.usbank.com/about-us-bank/privacy/security.html#tracking (last accessed September 13, 2024)
[3] *Id.*

Meta is not an affiliate of U.S. Bank and is otherwise a nonaffiliate of U.S. Bank. Because the Privacy Notice does not comply with the applicable regulations described above, Meta was prohibited from disclosing its customers' non-public personal information collected through the Meta Pixel, and those disclosures were unlawful under the GLB Act and related regulations.

58. Moreover, U.S. Bank's disclosures fail to adequately disclose the extent and nature of information sharing with third parties like Meta, omitting crucial details about the use of tracking technologies and the potential for this data to be used for marketing purposes. This lack of transparency and accuracy in U.S. Bank's privacy disclosures constitutes a material misrepresentation to customers and a violation of their reasonable expectations of privacy when engaging with a financial institution.

59. By disclosing Plaintiff's and Class Members' non-public personal information and PIFI to Meta without the required notice, U.S. Bank violated 16 C.F.R. § 313 (the "GLB Act Privacy Rule") and 12 C.F.R. § 1016 ("Regulation P"). U.S. Bank's use of the Meta Pixel to share customers' nonpublic personal information and online banking activities with Meta violates the Gramm-Leach-Bliley Act's restrictions on disclosing consumers' nonpublic personal information to unaffiliated third parties.

**IV. U.S. Bank's Conduct Was "Unfair" Under the Federal Trade Commission Act.**

60. The GLB Act's "Privacy Rule" became effective on July 1, 2001. 16 C.F.R. § 313.

61. The Federal Trade Commission ("FTC") has interpreted Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, to include compliance with the GLBA Privacy Rule.

62. Failing to comply with the GLB Act's Privacy Rule is an unfair act or practice prohibited by Section 5 of the FTC Act.

## PLAINTIFF'S EXPERIENCE

63. Plaintiff Christopher Butler is a U.S. Bank consumer and a Facebook user, and therefore Meta consumer.

64. Plaintiff joined Facebook around 2009 and has had a Facebook account during the entirety of his time as a U.S. Bank consumer.

65. Plaintiff visited U.S. Bank's website to provide and receive personal and financial information using the same browser that he uses to log in to Facebook, including while he was logged in to Facebook.

66. Specifically, Plaintiff had previously applied for a credit card on U.S. Bank's website.

67. As a condition of this application, Plaintiff was required to and did in fact input personal information into the U.S. Bank application for the credit card product.

68. U.S. Bank installed and utilized tracking technology known as the Meta Pixel on its website, which collected and transmitted personally identifiable financial information (PIFI) of users, including the Plaintiff.

69. U.S. Bank disclosed to Meta Plaintiff's personal and financial information, including any information related to the financial product for which Plaintiff was visiting U.S. Bank's website.

70. Indeed, shortly after filling out this application, Plaintiff noted an uptick in targeted advertising on Facebook, specifically as it related to interest rates concerning U.S. Bank's Money Market account products.

71. Both U.S. Bank's credit card and money market onboarding processes use the Meta Tracking Pixel.

72. Such targeted advertising suggests a direct connection between his activity on U.S. Bank's website and his use of his Facebook account.

73. This intrusion was intentional, as U.S. Bank would not have installed the Meta Pixel except to scrape this type of data and intercept it for purposes of sharing with a third party, like Meta.

74. The information involved in this intrusion is highly sensitive personally identifiable financial information as that term is defined and protected by the GLB Act, and its deliberate interception by U.S. Bank is highly offensive.

75. Plaintiff was unaware that their browsing activity on U.S. Bank's website, including the specific products they viewed and the information they provided, was being transmitted to Facebook via the Meta Pixel.

76. Had Plaintiff known that U.S. Bank was sharing their personal information and browsing activity with Facebook, they would not have interacted with U.S. Bank's website or provided any personal information.

## CLASS ACTION ALLEGATIONS

77. Pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff seeks certification of the following Class (alone, "Nationwide Class"):

> All persons in the United States who, within the applicable limitations period, (1) had a Facebook account; and (2) whose information was transmitted to Facebook as a result of the Meta Tracking Pixel installed on US Bank's website.

78. Plaintiffs also propose the following Subclass definition:

> All persons in the State of California who, within the applicable limitations period, (1) had a Facebook account; and (2) whose information was transmitted to Facebook as a result of the Meta Tracking Pixel installed on US Bank's website ("California Subclass").

79. Excluded from the Class are: (a) Defendant, Defendant's board members, executive-level officers, and attorneys, and immediately family members of any of the foregoing persons; (b) governmental entities; (c) the Court, the Court's immediate family, and the Court staff; and (d) any person that timely and properly excludes himself or herself from the Class in accordance with Court-approved procedures.

80. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as individual Class Members would use to prove those elements in individual actions alleging the same claims.

81. **Numerosity.** The size of the Class is so large that joinder of all members of the Class is impracticable. The exact number of Class Members is unknown, but U.S. Bank represents it has over 11 million consumers[4].

82. **Commonality and Predominance.** There are questions of law and fact common to the Class. These questions predominate over any questions affecting only individual Class Members. Predominating common questions include but are not limited to:

a. whether Defendant engaged in the conduct alleged herein;

b. whether Defendant knowingly disclosed Plaintiff's and Class Member's PIFI to Meta;

c. whether Defendant retained records of PIFI for Plaintiff and the Class Members for longer than necessary for the purpose for which it was collected;

[4] *See* https://www.usbank.com/about-us-bank/fact-sheet.html (last accessed August 29, 2024).

d. Whether Defendant's disclosure of Plaintiff's and Class Members' nonpublic personal information to third-parties violated federal, state, and local laws or industry standards;

e. Whether Defendant owed duties to Plaintiff and Class Members to protect their nonpublic personal information;

f. whether Defendant was unjustly enriched by its conduct;

g. whether Plaintiff and the Class Members consented to Defendant's disclosure of their nonpublic personal information; and

h. whether Plaintiff and the Class Members are entitled to actual, statutory, or other forms of damages and other monetary relief; and

i. whether Plaintiff and the Class Members are entitled to equitable relief, including but not limited to injunctive relief and equitable restitution.

83. Defendant engaged in a common course of conduct in contravention of the laws Plaintiff seeks to enforce individually and on behalf of the Class Members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. Moreover, the common questions will yield common answers.

84. **Typicality.** Plaintiff's claims are typical of the claims of the Class Members because Defendant injured all Class Members through the uniform misconduct described herein; U.S. Bank knowingly disclosed the PII of Plaintiff, the Class Members to Facebook as described herein; U.S. Bank unlawfully retained Plaintiff's and the Class Members' PII as described herein; and Plaintiff seeks the same relief as all Class Members.

85. Furthermore, there are no defenses available to Defendant that are unique to Plaintiff.

86. **Adequacy of Representation.** Plaintiff is a fair and adequate representative of each of the Class because Plaintiff's interests do not conflict with the Class Members' interests. Plaintiff will prosecute this action vigorously and is highly motivated to seek redress against Defendant. Furthermore, Plaintiff has selected competent counsel that are experienced in class action and other complex litigation. Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the Class and have the resources to do so.

87. **Injunctive and Declaratory Relief.** The requirements for maintaining a class action pursuant to Rule 23(b)(2) are met, as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each Class as a whole.

88. **Superiority.** The class action mechanism is superior to other available means for the fair and efficient adjudication of this controversy for reasons including but not limited to the following:

a. The damages individual Class Members suffered are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendant's conduct.

b. Further, it would be virtually impossible for the Class Members individually to redress effectively the wrongs done to them. Even if Class Members themselves could afford such individual litigation, the court system could not. Individualized litigation would unnecessarily increase the delay and expense to all parties and to the court system and presents a potential for inconsistent or contradictory rulings and judgments. By contrast,

the class action device presents far fewer management difficulties, allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

c. The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant.

d. The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications or that would substantively impair or impede their ability to protect their interests.

89. **Notice.** Plaintiff and his counsel anticipate that notice to the proposed Class will be effectuated through recognized, Court-approved notice dissemination methods, which may include United States mail, electronic mail, Internet postings, and/or published notice.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of California's Unfair Competition Law**
**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**
**(Violation of the California Financial Information Privacy Act)**
**(On Behalf of Plaintiff and the California Subclass)**

90. Plaintiff repeats and re-alleges each and every allegation above as if fully set forth here.

91. The California Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

92. The acts, omissions, misrepresentations, practices, and non-disclosures of as alleged herein constitute business acts and practices.

93. As described below, the acts alleged herein are "unlawful" under the UCL in that they violate the California Financial Information Privacy Act ("FIPA"), Cal. Fin. Code § 4050 *et seq*.

**Violation of the California Financial Information Privacy Act**

94. The California Legislature's intent in passing FIPA was "for financial institutions to provide their consumers notice and meaningful choice about how consumers' nonpublic personal information is shared or sold by their financial institutions." Cal. Fin. Code § 4051(a).

95. Further, in enacting FIPA, the California Legislature intended "to afford persons greater privacy protections than those provided in Public Law 106-102, the federal Gramm-Leach-Bliley Act, and that this division be interpreted to be consistent with that purpose." *Id.* § 4051(b).

96. Pursuant to FIPA, the California Legislature made the following declarations:

a. "The California Constitution protects the privacy of California citizens from unwarranted intrusions into their private and personal lives."

b. "Federal banking legislation, known as the Gramm-Leach-Bliley Act, which breaks down restrictions on affiliation among different types of financial institutions, increases the likelihood that the personal financial information of California residents will be widely shared among, between, and within companies."

c. "The policies intended to protect financial privacy imposed by the Gramm-Leach-Bliley Act are inadequate to meet the privacy concerns of California residents."

d. "Because of the limitations of these federal policies, the Gramm-Leach-Bliley Act explicitly permits states to enact privacy protections that are stronger than those provided in federal law."

Cal. Fin. Code § 4051.5(a).

97. The California Legislature outlined its intentions in passing FIPA, as follows:

a. "To ensure that Californians have the ability to control the disclosure of what

the Gramm-Leach-Bliley Act calls nonpublic personal information."

b. "To achieve that control for California consumers by requiring that financial institutions that want to share information with third parties and unrelated companies seek and acquire the affirmative consent of California consumers prior to sharing the information."

c. "To further achieve that control for California consumers by providing consumers with the ability to prevent the sharing of financial information among affiliated companies through a simple opt-out mechanism via a clear and understandable notice provided to the consumer."

d. "To provide, to the maximum extent possible, consistent with the purposes cited above, a level playing field among types and sizes of businesses consistent with the objective of providing consumers control over their nonpublic personal information, including providing that those financial institutions with limited affiliate relationships may enter into agreements with other financial institutions as provided in this division, and providing that the different business models of differing financial institutions are treated in ways that provide consistent consumer control over information-sharing practices."

e. "To adopt to the maximum extent feasible, consistent with the purposes cited above, definitions consistent with federal law, so that in particular there is no change in the ability of businesses to carry out normal processes of commerce for transactions voluntarily entered into by consumers."

Cal. Fin. Code § 4051.5(b).

98. Defendant is a "financial institution" within the meaning of the statute. Cal. Fin. Code § 4052(c).

99. On information and belief, Meta is not an affiliate of, or related by common ownership or affiliated by corporate control with Defendant. As such, Meta is a "nonaffiliated third party" within the meaning of the statute. Cal. Fin. Code § 4052(e).

100. Plaintiff and the California Subclass members are "consumers" within the meaning of the statute. Cal. Fin. Code § 4052(f).

101. Under FIPA, "a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates." Cal. Fin. Code § 4052.5.

102. Per FIPA, "nonpublic personal information" "means personally identifiable financial information (1) provided by a consumer to a financial institution, (2) resulting from any transaction with the consumer or any service performed for the consumer, or (3) otherwise obtained by the financial institution." Cal. Fin. Code § 4052(a).

103. Per FIPA, "'[p]ersonally identifiable financial information' means information (1) that a consumer provides to a financial institution to obtain a product or service from the financial institution, (2) about a consumer resulting from any transaction involving a product or service between the financial institution and a consumer, or (3) that the financial institution otherwise obtains about a consumer in connection with providing a product or service to that consumer." Cal. Fin. Code § 4052(b).

104. The "onboarding" information that Defendant provided to Meta constitutes "personally identifiable information" under FIPA as it is "information (1) that a consumer provides to a financial institution to obtain a product or service from the financial institution."

105. Further, "[t]he fact that an individual is or has been a consumer of a financial institution or has obtained a financial product or service from a financial institution[,]" constitutes personally identifiable financial information under the statute. Cal. Fin. Code 4052(b)(3).

106. In transferring information to Meta about Plaintiff and the Class members, Defendant is revealing to Meta the fact that Plaintiff and the California Subclass members have a financial product or service with Defendant, and as such constitute personally identifiable financial information under the statute.

107. Still further, "[a]ny information about a financial institution's consumer if it is

disclosed in a manner that indicates that the individual is or has been the financial institution's consumer[,]" constitutes personally identifiable financial information under the statute. Cal. Fin. Code 4052(b)(4).

108. In transferring information to Meta about Plaintiff and the California Subclass members, Defendant is revealing to Meta the fact that Plaintiff and the California Subclass members have a financial product or service with Defendant, and as such constitute personally identifiable financial information under the statute.

109. Still further, "[a]ny personally identifiable financial information collected through an Internet cookie or an information collecting device from a Web server[,]" constitutes personally identifiable financial information under the statute. Cal. Fin. Code 4052(b)(6).

110. As described above, Defendant uses Internet cookies to gather Plaintiff's and the California Subclass members' information. *See supra* ¶¶ 30-32. Any information collected by these cookies constitutes personally identifiable financial information under the statute. Cal. Fin. Code 4052(b)(6).

111. Equally, the Meta Pixel is an information collecting device from a Web server. Any information collected by the Pixel constitutes personally identifiable financial information under the statute. Cal. Fin. Code § 4052(b)(6).

112. All of the personally identifiable financial information was "(1) provided by a consumer to a financial institution, (2) resulting from any transaction with the consumer or any service performed for the consumer, or (3) otherwise obtained by the financial institution." As such it constitutes "nonpublic personal information" under the statute. Cal. Fin. Code § 4052(a).

113. By "sell[ing], shar[ing], transfer[ing], or otherwise disclos[ing] nonpublic personal information" described above with Meta, Defendant violated FIPA.

114. Additionally, per FIPA, "[a] financial institution shall not disclose to, or share a consumer's nonpublic personal information with, any nonaffiliated third party as prohibited by Section 4052.5, unless the financial institution has obtained a consent acknowledgment from the consumer that complies with paragraph (2) that authorizes the financial institution to disclose

or share the nonpublic personal information." Cal. Fin. Code § 4053(a)(1).

115. Per the above-referenced paragraph (2), "[a] financial institution shall utilize a form, statement, or writing to obtain consent to disclose nonpublic personal information to nonaffiliated third parties as required by Section 4052.5 and this subdivision. The form, statement, or writing shall meet all of the following criteria" including:

a. "The form, statement, or writing is dated and signed by the consumer"; and

b. "The form, statement, or writing clearly and conspicuously discloses that by signing, the consumer is consenting to the disclosure to nonaffiliated third parties of nonpublic personal information pertaining to the consumer."

116. Additionally, "[i]f a financial institution does not use the form set forth in this subdivision, the financial institution shall use a form that meets all of the following requirements" including:

a. "The form uses the same title ('IMPORTANT PRIVACY CHOICES FOR CONSUMERS') and the headers, if applicable, as follows: 'Restrict Information Sharing With Companies We Own Or Control (Affiliates)' and 'Restrict Information Sharing With Other Companies We Do Business With To Provide Financial Products And Services';"

b. "The form avoids explanations that are imprecise and readily subject to different interpretations"; and

c. "The form is not more than one page."

117. Defendant purports to provide notice to Plaintiff and the California Subclass members through its Privacy Policy and California Privacy Center policy. *See* ECF No. 16 at 20.

118. Neither privacy policy meets the requirements for FIPA for the following reasons:

a. Neither Plaintiff nor the California Subclass members signed either policy. Cal. Fin. Code § 4053(a)(2)(B);

b. Neither policy states that "by signing" Plaintiff and the California Subclass members are "consenting to the disclosure to nonaffiliated third parties of

nonpublic personal information pertaining to the consumer." Cal. Fin. Code § 4053(a)(2)(C);

c. Neither policy uses any of the following phrases:

    i. "IMPORTANT PRIVACY CHOICES FOR CONSUMERS";

    ii. "Restrict Information Sharing With Companies We Own Or Control (Affiliates)"; or

    iii. "Restrict Information Sharing With Other Companies We Do Business With To Provide Financial Products And Services".

d. Both policies use explanations that are imprecise and readily subject to different interpretations. Such phrases include, but are not limited to, "advertising efforts," "certain email communications," and "to another party." These phrases are imprecise. For example, the phrase "to another party" does not identify which party, such as Meta. Likewise, the phrase "certain email communications," does not state which email communications. The phrase "advertising efforts" does not explain what the "advertising efforts" are. These are just a few of the many instances of imprecise language used in the policies.

e. Both policies are more than one page. The privacy policy, when printed as a pdf is 11 pages while the California Privacy Center policy is 32 pages.

119. Each of the above is a violation of the necessary requirements for notice under FIPA.

120. As such each constitutes separate grounds on which to find the Privacy Policy and California Privacy Center policy are inadequate notice under FIPA.

121. As such, each constitutes a separate failure by Defendant to provide adequate notice and receive consent under FIPA, and therefore each constitutes a separate a separate violation of FIPA. Cal. Fin. Code § 4053.

122. In sum, and as described above, Defendant violated FIPA by disclosing nonpublic personal information to a nonaffiliated third party (Meta), and by failing to provide adequate notice

and receive adequate consent that meets the standards required by FIPA.

**Relief Under the UCL**

123. Defendant's violations of FIPA are enforceable through the unlawful prong of the UCL, and constitute violations of the unlawful prong of the UCL.

124. Defendants' violations of the UCL continue to this day. Pursuant to California Business and Professional Code § 17203, Plaintiff and the Subclass seek an order of this Court that includes, but is not limited to, an order requiring Defendants to:

a. Remove and/or refrain from disclosing Plaintiff and the California Subclass members' information to Meta;

b. Provide restitution to Plaintiff and the other California Subclass members;

c. Disgorge all revenues obtained as a result of violations of the UCL; and

d. Pay Plaintiff's and the Subclass' attorneys' fees and costs.

125. Plaintiff also seeks a public injunction to enjoin Defendants' unlawful methods, acts, and practices alleged herein. Such injunctive relief may include, but is not limited, to disclosing to all US Bank customers and potential customers all of the information that Defendant discloses to Meta and to obtain the requisite signed consent under FIPA. If the injunctive relief is not granted, and Defendant is permitted to continue to engage in these practices, California's general public will continue to suffer harm.

**COUNT II**
**Violation of California's Unfair Competition Law**
**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**
**(Violation of the Gramm-Leach-Bliley Act)**
**(On Behalf of Plaintiff and the California Subclass)**

126. Plaintiff repeats and re-alleges each and every allegation above as if fully set forth here.

127. The California Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

128. The acts, omissions, misrepresentations, practices, and non-disclosures of as alleged herein constitute business acts and practices.

129. As described below, the acts alleged herein are "unlawful" under the UCL in that they violate the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801, *et seq.*

**Violation of the Gramm-Leach-Bliley Act**

130. In passing the GLB, "[i]t [was] the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

131. Defendant is a "financial institution" within the meaning of the statute. 15 U.S.C. § 6809(3)(A).

132. On information and belief, Meta is not an affiliate of, or related by common ownership or affiliated by corporate control with Defendant. As such, Meta is a "nonaffiliated third party" within the meaning of the statute. 15 U.S.C. § 6809(5).

133. Plaintiff and the California Subclass members are "consumers" within the meaning of the statute. 15 U.S.C. § 6809(9).

134. Under GBL, "[a] financial institution may not disclose nonpublic personal information to a nonaffiliated third party unless":

a. "such financial institution clearly and conspicuously discloses to the consumer, in writing or in electronic form or other form permitted by the regulations prescribed under section 6804 of this title, that such information may be disclosed to such third party;";

b. "the consumer is given the opportunity, before the time that such information is initially disclosed, to direct that such information not be disclosed to such third party;" and

c. "the consumer is given an explanation of how the consumer can exercise that nondisclosure option."

15 U.S.C. § 6802(b)(1).

135. Per GLB, "nonpublic personal information" "personally identifiable financial

information (i) provided by a consumer to a financial institution; (ii) resulting from any transaction with the consumer or any service performed for the consumer; or (iii) otherwise obtained by the financial institution." 15 U.S.C. § 6802(b)(1).

136. Per GLB, "[p]ersonally identifiable financial information" means "any information: (i) [a] consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution], (ii) [a]bout a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer, or (iii) [a financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer." 16 C.F.R. § 313.3(o)(1); 12 CFR § 1016.3(q)(1).

137. The "onboarding" information that Defendant provided to Meta constitutes "personally identifiable information" under GBL as it is information "[a] consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution]."

138. Further, "[t]he fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution]" constitutes personally identifiable financial information under the statute. 16 C.F.R. § 313.3(o)(2)(C).

139. In transferring information to Meta about Plaintiff and the Class members, Defendant is revealing to Meta the fact that Plaintiff and the California Subclass members have a financial product or service with Defendant, and as such constitute personally identifiable financial information under the statute.

140. Still further, "[a]ny information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [a financial institution's] consumer[,]" constitutes personally identifiable financial information under the statute. 16 C.F.R. § 313.3(o)(2)(D).

141. In transferring information to Meta about Plaintiff and the California Subclass members, Defendant is revealing to Meta the fact that Plaintiff and the California Subclass members have a financial product or service with Defendant, and as such constitute personally identifiable financial information under the statute.

142. Still further, "[a]ny information [a financial institution] collect[s] through an Internet 'cookie' (an information collecting device from a web server)[,]" constitutes personally identifiable financial information under the statute. 16 C.F.R. § 313.3(o)(2)(F).

143. As described above, Defendant uses Internet cookies to gather Plaintiff and the California Subclass members' information. *See supra* ¶¶ 30-32. Any such information constitutes personally identifiable financial information under the statute. 16 C.F.R. § 313.3(o)(2)(F).

144. Equally, the Meta Pixel is an information collecting device from a web server. Any such information constitutes personally identifiable financial information under the statute. 16 C.F.R. § 313.3(o)(2)(F).

145. All of the personally identifiable financial information was "(i) provided by a consumer to a financial institution; (ii) resulting from any transaction with the consumer or any service performed for the consumer; or (iii) otherwise obtained by the financial institution." As such it constitutes "nonpublic personal information" under the statute. 15 U.S.C. § 6802(b)(1).

146. By "sell[ing], shar[ing], transfer[ing], or otherwise disclos[ing] nonpublic personal information" described above with Meta, Defendant violated GLB.

147. Additionally, per GLB, "a financial institution may not, directly or through any affiliate, disclose to a nonaffiliated third party any nonpublic personal information, unless such financial institution provides or has provided to the consumer a notice that complies with section 6803 of this title." 15 U.S.C. § 6802(a).

148. Defendant purports to provide notice to Plaintiff and the California Subclass members through Privacy Policy and California Privacy Center policy. *See* ECF No. 16 at 20.

149. Per section 6803(a), such notice must be "clear and conspicuous" and provided annually. 15 U.S.C. § 6803(a).

150. The regulations have defined "clear and conspicuous" to mean "that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1).

151. Examples of the notice being "reasonably understandable" include "[a]voiding

explanations that are imprecise and readily subject to different interpretations." 16 C.F.R. § 313.3(b)(2)(F).

152. Both policies use explanations that are imprecise and readily subject to different interpretations. Such phrases include, but are not limited to, "advertising efforts," "certain email communications," and "to another party." These phrases are imprecise. For example, the phrase "to another party" does not identify which party, such as Meta. Likewise, the phrase "certain email communications," does not state which email communications. The phrase "advertising efforts" does not explain what the "advertising efforts" are. These are just a few of the many instances of imprecise language used in the policies.

153. Per the regulations, when the financial institutions

> provide[s] a notice on a web page, you design your notice to call attention to the nature and significance of the information in it if you use text or visual cues to encourage scrolling down the page if necessary to view the entire notice and ensure that other elements on the web site (such as text, graphics, hyperlinks, or sound) do not distract attention from the notice, and you either:
>
> > (A) Place the notice on a screen that consumers frequently access, such as a page on which transactions are conducted; or
> >
> > (B) Place a link on a screen that consumers frequently access, such as a page on which transactions are conducted, that connects directly to the notice and is labeled appropriately to convey the importance, nature and relevance of the notice.

16 C.F.R. § 313.3(b)(2)(iii).

154. While Defendant provides a link to the website Privacy Policy, that link simply states what it is but fails "to convey the importance, nature and relevance of the notice." As such, it does not constitute clear and conspicuous notice.

155. Each of the above is a violation of the necessary requirements for notice under GLB.

156. As such each constitutes separate grounds on which to find the Privacy Policy and California Privacy Center policy are inadequate notice under GLB.

157. As such, Defendant failed to provide adequate notice and receive consent under

GLB, which constitutes a separate violation of GLB.

158. In sum, and as described above, Defendant violated GLB by disclosing nonpublic personal information to a nonaffiliated third party (Meta), and by failing to provide adequate notice that meets the standards required by GLB.

**Relief Under the UCL**

159. Defendant's violations of GLB are enforceable through the unlawful prong of the UCL, and constitute violations of the unlawful prong of the UCL.

160. Defendants' violations of the UCL continue to this day. Pursuant to California Business and Professional Code § 17203, Plaintiff and the Subclass seek an order of this Court that includes, but is not limited to, an order requiring Defendants to:

a. Remove and/or refrain from disclosing Plaintiff and the California Subclass members' information to Meta;

b. Provide restitution to Plaintiff and the other California Subclass members;

c. Disgorge all revenues obtained as a result of violations of the UCL; and

d. Pay Plaintiff's and the Subclass' attorneys' fees and costs.

161. Plaintiff also seeks a public injunction to enjoin Defendants' unlawful methods, acts, and practices alleged herein. Such injunctive relief may include, but is not limited, to clearly and conspicuously disclosing to all US Bank customers and potential customers all of the information that Defendant discloses to Meta. If the injunctive relief is not granted, and Defendant is permitted to continue to engage in these practices, California's general public will continue to suffer harm.

**COUNT III**
**Violation of California Consumer Privacy Act**
**Ca. Civ. Code §§ 1798.100, *et seq.* ("CCPA")**
**(On Behalf of Plaintiff and the California Subclass)**

162. Plaintiff re-alleges and incorporates by reference paragraphs all paragraphs above as if fully set forth herein.

163. At all relevant times, Defendant has done business in the State of California.

164. The CCPA imposes a duty on entities doing business in California to implement and maintain reasonably security procedures and practices as appropriate given the nature of the sensitive information. Ca. Civ. Code § 1798.100.

165. Under the CCPA, "[a] business that, acting as a third party, controls the collection of personal information about a consumer" must inform the consumer of (i) the information being collected, (ii) the purpose for collecting the information and if that information is to be shared or sold, and (iii) the companies' retention policies. *Id*. at (a).

166. The CCPA requires that a business's collection, use, retention, and sharing of a consumer's personal information be reasonably necessary and proportionate to achieve the purposes for which the personal information was collected or processed, or for another disclosed purpose that is compatible with the context in which the personal information was collected, and not further processed in a manner that's incompatible with those purposes. *Id*. at (b).

167. Pursuant to CCPA, any individual whose nonencrypted and nonredacted personal information is accessed, exfiltrated, stolen, or disclosed as a result of the business's violation of their duty are entitled to damages, including statutory damages. *Id*. at § 1798.150.

168. Defendant collected Plaintiff's and California Subclass Members' non-public personally identifiable financial information with the purpose of providing products as part of its business in California.

169. Defendant disclosed this highly sensitive financial and personal information to third-parties, such as Meta, in violation of the CCPA.

170. Pursuant to Ca. Civ. Code § 1798.150(b), Plaintiff sent Defendant notice of her CCPA claims on September 18, 2024. To date, Defendant has failed to cure the CCPA violation.

171. As a result of Defendant's CCPA violation, Plaintiff and the California Subclass are entitled to actual damages and statutory damages of $750 per customer record subject to

Defendant's unlawful, deliberate disclosure of customer information.

**COUNT IV**
**Invasion of Privacy**
**(On Behalf of Plaintiff and the Class or alternatively the California Subclass)**

172. Plaintiff repeats and re-alleges each and every allegation above as if fully set forth here.

173. The PIFI of Plaintiff and Class Members consists of private and confidential facts and information that were never intended to be shared beyond private communications.

174. Plaintiff and Class Members interacted with Defendant's website with the expectation that any information shared would remain strictly confidential and used solely for the purpose of providing financial services. Defendant's position as a financial institution amplified this reasonable expectation of privacy.

175. Plaintiff and Class Members had a legitimate expectation of privacy regarding their PIFI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

176. Defendant owed a duty to Plaintiff and Class Members to keep their PIFI confidential.

177. Defendant's unauthorized disclosure of Plaintiff's and Class Members' PIFI to Meta, a third-party social media and marketing giant, is highly offensive to a reasonable person.

178. The transmission of Plaintiff's and Class Members' private financial data to Meta, a non-financial third party, for commercial purposes, constitutes a highly offensive intrusion into private matters.

179. This highly offensive nature is evidenced by the California Legislature's statement of intent in passing FIPA, including its invocation of the California Constitution's protection of "the privacy of California citizens from unwarranted intrusions into their private and personal lives." Cal. Fin. Code § 4051.5(a)(1).

180. This highly offensive nature is further evidenced by the California Legislature's statement of intent "[t]o ensure that Californians have the ability to control the disclosure of what

the Gramm-Leach-Bliley Act calls nonpublic personal information," and "[t]o achieve that control for California consumers by requiring that financial institutions that want to share information with third parties and unrelated companies seek and acquire the affirmative consent of California consumers prior to sharing the information." Cal. Fin. Code § 4051.5(b)(1)-(2).

181. This highly offensive nature is further evidenced by Congress' statement that "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

182. The disclosed information, including financial product applications and user session details, exceeds the scope of acceptable data sharing in financial transactions.

183. The information provided to Defendant was intended for the sole purpose of obtaining financial services and was given with the expectation that it would remain confidential and not be shared with third parties for unrelated purposes.

184. Defendant's willful and intentional disclosure of Plaintiff's and Class Members' PIFI constitutes intentional interference with Plaintiff's and Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

185. Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and Class Members' privacy because Defendant facilitated Meta's simultaneous collection and exploitation of confidential communications.

186. Defendant failed to protect Plaintiff' and Class Members' PIFI and acted knowingly when it installed the Pixel onto its Website because the purpose of the Pixel is to track and disseminate individuals' communications with the Website for the purpose of marketing and advertising.

187. Because Defendant intentionally and willfully incorporated the Meta Pixel into its Website and encouraged consumers to use that Website for banking and financial purposes, Defendant had notice and knew that its practices would cause injury to Plaintiff and Class

Members.

188. As a proximate result of Defendant's acts and omissions, the private and sensitive PIFI of Plaintiff and Class Members was disclosed to a third party without authorization, exposing them to risks of targeted advertising, profiling, and further misuse of their private information, causing Plaintiff and the Class to suffer damages.

189. Plaintiff, on behalf of himself and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs.

190. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PIFI is still maintained by Defendant and still in the possession of Meta and the wrongful disclosure of the information cannot be undone.

191. Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Meta who, on information and belief, continues to possess and utilize that information.

192. Plaintiff, on behalf of themselves and Class Members, further seek injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiff's and Class Members' PIFI and to adhere to its common law, contractual, statutory, and regulatory duties.

## COUNT V
## Breach of Implied Contract
## (On Behalf of Plaintiff and the Class or alternatively the California Subclass)

193. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth here.

194. As a condition of utilizing Defendant's Website and receiving services from Defendant's financial facilities and professionals, Plaintiff and Class Members provided their PIFI and compensation for their financial services.

195. When Plaintiff and Class Members provided their PIFI to Defendant, they entered

into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their PIFI without consent.

196. This implied contract is created, in part, by Defendant's Privacy Policies, which at all relevant times include representations that Defendant will not intercept sensitive communications for financial gain.

197. Defendant states in its Privacy Policy, indicative but not wholly governing of the implied contract between the parties:

> We use third-party service providers to distribute our advertisements on websites and mobile applications where we have paid to advertise. These advertisements may use tracking technologies to capture information such as IP address, browser type and usage information in order to track the effectiveness of our advertising efforts. We may associate the information collective by these technologies with your identity. Our advertising service providers are prohibited from using any information collected except to track advertising effectiveness.[5]

198. Notably, Defendant's Privacy Policy does not permit it to intercept, transmit, and/or disclose their sensitive financial and private information for marketing purposes.

199. Plaintiff and Class Members would not have entrusted Defendant with their PIFI in the absence of an implied contract between them and Defendant obligating Defendant to not disclose PIFI without consent.

200. Plaintiff and Class Members would not have retained Defendant to provide financial services in the absence of an implied contract between them and Defendant obligating Defendant to not disclose PIFI without consent.

201. Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' PIFI without consent to third parties like Meta.

202. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged in this Complaint, including, but not limited to, the loss of the benefit of their bargain and diminution in value of PIFI.

---

[5] https://www.usbank.com/about-us-bank/privacy/security.html#tracking (last accessed September 13, 2024)

203. Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

**COUNT VI**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class or alternatively the California Subclass)**

204. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth here.

205. Defendant benefits from the use of Plaintiff's and Class Members' PIFI and unjustly retained those benefits at their expense.

206. Plaintiff and Class Members conferred a benefit upon Defendant in the form of PIFI that Defendant collected from Plaintiffs and Class Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

207. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

208. The benefits that Defendant derived from Plaintiff and Class Members was not offered by Plaintiff and Class Members gratuitously and rightly belongs to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in Minnesota, California, and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

209. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**COUNT VII**
**Violations of Electronic Communications Privacy Act**
**("ECPA")**
**18 U.S.C. § 2511(1) et seq.**
**UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE**
**(On Behalf of Plaintiff and the Class)**

210. Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth here.

211. The ECPA protects both sending and receipt of communications.

212. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

213. The transmissions of Plaintiff's PIFI to Defendant via Defendant's Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

214. The transmissions of Plaintiff's PIFI to the U.S. Bank Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

215. The intercepted communications included the substance of Plaintiff's activities on U.S. Bank's website, such as product application details, specific queries, and onboarding data for financial products. This qualifies as "contents" under 18 U.S.C. § 2510(8), as it reflects the intended message conveyed during Plaintiff's online interactions.

216. Electronic Communications. The transmission of PIFI between Plaintiff and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that

affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

217. Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

218. Interception. The ECPA defines interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

219. Electronic, Mechanical, or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiff's and Class Members' browsers;

b. Plaintiff's and Class Members' computing devices;

c. Defendant's web-servers; and

d. The Pixel deployed by Defendant to effectuate the sending and acquisition of patient communications.

220. Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Pixel imbedded and run on its Website, contemporaneously and intentionally disclosed, and endeavored to disclose, the contents of Plaintiff's and Class Members' electronic communications to third parties, including Facebook, without authorization or consent

and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c).

221. Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Pixel imbedded and run on its Website, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiff's and Class Members' electronic communications, for purposes other than providing financial services to Plaintiff and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(d).

222. Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the source code it imbedded and ran on its web properties, contemporaneously and intentionally redirected the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Meta.

223. Defendant's intercepted communications include, but are not limited to, onboarding information is collected by U.S. Bank and sent to Meta for the following products offered by U.S. Bank:

e. Credit Card applications;

f. Money Market accounts;

g. LGBTQ+ Family Planning Loans;

h. Loans and credit lines;

i. Debt Consolidation;

j. Home Repair Financing;

k. Private Seller Vehicle Loans; and

l. Vehicle loans.

224. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

225. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

226. Defendant intentionally used the wire or electronic communications for its own business purposes, unrelated to the transactions between Plaintiff, Class members and Defendant. Defendant specifically used the Pixel to track and utilize Plaintiff's and Class Members' Private Information for its own gain.

227. Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

228. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Pixel tracking code.

229. Any purported consent that Defendant received from Plaintiff and Class Members was not valid. *See e.g.* Cal. Fin. Code § 4053(a)(2)(B) (requiring consent to be "dated and signed by the consumer").

230. Defendant failed to provide adequate notice or obtain informed consent before intercepting and transmitting Plaintiff's electronic communications to Meta. Defendant's privacy

policy did not disclose the specific use of tracking technologies, including the Meta Pixel, or the scope of data shared with third parties.

231. As a result of Defendant's violation of the ECPA, Plaintiff and the Class Members entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory damages, and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the members of the Class, respectfully requests the Court to enter an Order:

A. certifying the proposed Class under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), as set forth above;

B. declaring that Defendant is financially responsible for notifying the Class Members of the pendency of this suit;

C. declaring that Defendant has committed the violations of law alleged herein;

D. providing for any and all injunctive relief the Court deems appropriate;

E. awarding statutory damages in the maximum amount for which the law provides;

F. awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

G. providing for any and all equitable monetary relief the Court deems appropriate;

H. awarding Plaintiff her reasonable costs and expenses of suit, including attorney's fees;

I. awarding pre- and post-judgment interest to the extent the law allows; and

J. providing such further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all claims so triable.

Date: January 14, 2025

Respectfully submitted,

By: */Charles D. Moore*

Charles D. Moore
MN Bar No. 0396066
*cmoore@reesellp.com*
**REESE LLP**
100 South 5th Street, Suite 1900
Minneapolis, MN 55402
Telephone: (212) 643-0500

Michael R. Reese (*pro hac vice* filed)
*mreese@reesellp.com*
**REESE LLP**
100 West 93rd Street, 16th Floor
New York, NY 10025
Telephone: (212) 643-0500

Kevin Laukaitis (*pro hac vice* forthcoming)
*klaukaitis@laukaitislaw.com*
**LAUKAITIS LAW LLC**
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
Telephone: (215) 789-4462

*Counsel for Plaintiff [Plaintiff]*
*and the Proposed Class*