**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Christopher Butler, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>U.S. BANCORP,<br><br>Defendant. | Case No. 0:24-cv-03700 |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff Christopher Butler ("Plaintiff"), by and through his attorneys, responds in opposition to Defendant U.S. Bancorp's ("U.S. Bank" or "Defendant") Motion to Dismiss ("Motion").

**INTRODUCTION**

This case is about U.S. Bank unlawfully taking customers' private financial information and sharing it with Facebook (now Meta) without permission. Defendant did this by placing a small tracking tool called the "Meta Pixel" on its website.

The Pixel is a tracking code that Facebook provides to companies for marketing purposes to boost revenues. When installed on a website, it tracks what visitors do – which pages they view, what they click on, and even what information they enter into forms. It then sends this data back to Facebook, allowing companies like U.S. Bank to show targeted ads to those same people when they later use Facebook or Instagram. Companies use the Pixel because it helps them find new customers similar to their existing ones and measure how well their ads are working.

When customers like Plaintiff visited U.S. Bank's website to check accounts or apply for loans, this hidden tracking tool collected their sensitive information - including Social Security numbers and financial details - and sent it directly to Facebook. This was not an accident. U.S. Bank chose to add this tracking tool to its website.

U.S. Bank wants the Court to believe this is just normal website operation. However, it is actually a serious privacy violation. Financial information is among the most protected data under the law for good reason - it is extremely personal and valuable. In fact, Congress passed law placing major restrictions on financial companies'—like U.S. Bank—ability to share such information. California went even further in passing an even stricter law that only allows the sharing of such information if the bank gets ***signed*** permission from the customer. U.S. Bank does not even pretend to have such a signature. Instead, it attempts to deflect the Court from its unlawful conduct by claiming customers knew about this sharing through its privacy policies. However, these policies never clearly say, "We will send your financial information to Facebook." Instead, they used vague terms like "third parties" and "advertising efforts" to hide what was happening.

Plaintiff brings this class action on behalf of all U.S. Bank customers whose sensitive financial information was exposed without proper consent. When customers applied for a loan, checked their accounts, or considered financial products, their private data was secretly sent to Facebook. This is the exact conduct Congress and the California legislature sought to curb when enacting laws like the Electronic Communications Privacy Act and California's Financial Information Privacy Act to protect consumers from unauthorized data sharing. U.S. Bank deliberately violated these laws for its own profit.

The motion to dismiss should be denied, and U.S. Bank must be held accountable for this widespread violation of its customers' privacy rights.

## FACTUAL BACKGROUND

U.S. Bank is a major financial services provider that offers retail, business, wealth management, payment, commercial and corporate, and investment services to customers across the country and around the world. *See* First Amended Complaint ("FAC") ¶ 2. U.S. Bank's online banking website— www.usbank.com —allows consumers to access their account information. U.S. Bank monitors and records customers' interactions with its website to access their confidential account information. *Id*. ¶¶ 3-4. U.S. Bank shares customer interactions through its website with Meta, which owns, among other platforms, the social networking website and app Facebook. Unbeknownst to and undisclosed to consumers, U.S. Bank unlawfully discloses this information to Facebook using the Meta Pixel ("Pixel"), a snippet of programming code U.S. Bank chose to install on its website that sends information about its users to Facebook. ¶¶ 5-6. The information shared by U.S. Bank with Meta includes sensitive and valuable consumer onboarding information such as: Credit Card applications; Money Market accounts; LGBTQ+ Family Planning Loans; Loans and credit lines; Debt Consolidation; Home Repair Financing; Private Seller Vehicle Loans; and Vehicle loans (collectively, "personally identifiable financial information" or "PIFI"). *Id*. ¶ 8. Considering the massive size of U.S. Bank's customer base, which Plaintiff seeks to represent, Defendant shared vast amounts of valuable consumer data with Meta for U.S. Bank and Meta to profit from.

Based on U.S. Bank's unlawful use of the Meta Pixel, Plaintiff asserts causes of action for (1) violation of the California Unfair Competition Law ("UCL") premised on a violation of the California Financial Information Privacy Act ("FIPA"); (2) violation of the UCL based on a violation of the federal Gramm-Leach-Bliley Act ("GLBA"); (3) violation of the California Consumer Privacy Act ("CCPA"); (4) Invasion of Privacy, (5) Breach of Implied Contract; (6) Unjust Enrichment, and (7) violations of the federal Electronic Communications Privacy Act ("ECPA"). *Id.* ¶¶ 90–231. For the reasons stated below, Defendant's motion should be denied.

## ARGUMENT

### I. Plaintiff's Claims Meet the Plausibility Standard

"[T]o withstand a motion to dismiss for failure to state a claim, the factual allegations in a complaint need not be detailed; rather, they must be sufficient to 'raise a right to relief above the speculative level' and 'state a claim to relief that is plausible on its face.'" *Greenley v. Laborers' Int'l Union of N.A.*, 271 F.Supp.3d 1128, 1141 (D. Minn. 2017) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "There is no requirement for direct evidence; the factual allegations may be circumstantial and need only be enough to nudge the claim across the line from conceivable to plausible." *Greenley*, 271 F.Supp.3d at 1141 (quoting *McDonough v. Anoka Cty.*, 799 F.3d 931, 945 (8th Cir. 2015)).

In moving to dismiss, U.S. Bank speaks out of both sides of its mouth. When arguing Plaintiff failed to meet the plausibility standard, it claims Plaintiff did not provide sufficient detail to "even begin to verify these allegations or respond to them[.]" Def. Mem. at 5. It

claims to need to know "what information [Plaintiff] entered into the Website, what information the Meta Pixel collected about him, or how any of the collected information constitutes PIFI." *Id.* at 4.

However, a few pages later, U.S. Bank claims the Privacy Policy "clearly explains the type of information U.S. Bank collects, the entities U.S. Bank shares that information with, and how a website visitor can opt out of having their information shared." Def. Mem. at 13. It later states that the California Privacy Center policy "similarly details the categories of personal information that U.S. Bank collects and discloses, and how a user can opt out of having their information shared." *Id.* at 14.

U.S. Bank cannot have it both ways. It cannot be heard to say that it has no idea what information ***it*** is collecting and distributing, but simultaneously, that every consumer is well aware of the information ***it*** is collecting and distributing.[1] The argument is nonsensical. U.S. Bank knows what information it collects and distributes, or at the very least, the information is readily obtainable from within its own organization. But it need not look any further than the Privacy Policy, which, under the heading "Types of Information We Collect," states,

> "Personal information" refers to information that identifies (whether directly or indirectly) a particular individual, such as information you provide on our forms, surveys, applications or similar online fields. Examples may include your name, postal address, email address, telephone number, Social Security

[1] Unlike U.S. Bank's position, which requires the Court to accept that U.S. Bank simultaneously has and does not have certain information, Plaintiff's position does not require such an internal contradiction. It is reasonable that U.S. Bank knows what information ***it*** collects and distributes, but consumers do not. Thus, the allegations meet the plausibility standard, while the notices to consumers are not legally sufficient.

number, date of birth or account information.

*See* Privacy Policy.

The California Privacy Center policy is even more specific. For example, the information it claims to collect includes, but is not limited to:

> Identifiers — A real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, Social Security number, driver's license number, passport number, signature or other similar identifiers.
>
> Sensitive personal information — Social Security number, driver's license, state identification card, or passport number; your account log-in, financial account, debit card, or credit card number in combination with any required security or access code, password, or credentials allowing access to an account; racial or ethnic origin, religious beliefs, or union membership; the contents of your mail, email, and text messages unless U.S. Bank was the intended recipient of the communication; health data; precise geolocation data; biometric information; and sex life or sexual orientation data
>
> Protected classification characteristics under California or federal law — Age (40 years or older), race, color, ancestry, national origin, citizenship, religion or creed, marital status, medical condition, physical or mental disability, sex (including gender, gender identity, gender expression, pregnancy or childbirth and related medical conditions), sexual orientation, veteran or military status, genetic information (including familial genetic information)
>
> Biometric information — Fingerprints, faceprints, voiceprints and behavioral patterns

*See* California Privacy Center policy ("Categories of personal information we collect").

Equally, the California Privacy Center policy states ***where*** such information is obtained, such as:

> We will collect the personal information described above from one or more of the following sources: . . . Directly from you or your company when you provide this information to us, when you request information, apply for products or services from us, use our websites or applications, respond to surveys, contact customer support, when you visit our ATMs, branches or

offices or attend a U.S. Bank event, or otherwise interact with us[.]

*See* California Privacy Center policy ("Where we collect your personal information").

The Privacy Policy states, in part, "[i]n addition, we may collect information about your activity on the Services automatically using tracking technologies, such as cookies, and pixel tags." In describing the "pixel tags," the Privacy Policy states, "[t]hese are typically small pieces of data that are embedded in images on the Website, our Applications or certain email communications."

Because they are "small pieces of data that are embedded in images on the Website," by their very nature, Plaintiff—at this stage—will not know specifically which images they are embedded in. However, U.S. Bank, as the creator and administrator of ***its*** website, knows or can readily determine what pages and images these "small pieces of data are embedded in."

Ultimately, "[t]he *Twombly* plausibility standard ... does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910, 929 (9th Cir. 2017) (quoting *Arista Records, LLC v. Does 3*, 604 F.3d 110, 120 (2d Cir. 2010)); *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 602 (8th Cir. 2009) ("It would be perverse to require plaintiffs bringing prohibited transaction claims to plead facts that remain in the sole control of the parties who stand accused of wrongdoing"); *Merchant & Gould, PC v. Premiere Global Serv. Inc.*, 749 F.Supp.2d 923, 938 (D. Minn. 2010) ("while it is understandable that defendants would have preferred that M & G set forth

detailed facts as to how defendants counseled customers to bypass filters, the identity of each customer at issue, the details of their advice on how to use their fax services to save money in their advertising, and how they assisted in generating fax number lists for customers, as a practical matter, it would be impossible for M & G to plead this type of information when much of it is in the control of defendants").

Plaintiff's FAC pleads more than sufficient detail to "nudge the claim across the line from conceivable to plausible." *Greenley*, 271 F.Supp.3d at 1141. It is "perverse to require [Plaintiff] . . . to plead facts that remain in the sole control of the parties who stand accused of wrongdoing." *Braden*, 588 F.3d at 602.

## II. Plaintiff Has Stated a Plausible Claim Under the Electronic Communications Privacy Act (ECPA), 18 U.S.C. § 251

U.S. Bank moves to dismiss Plaintiff's ECPA claim on two grounds. First, Defendant claims to be exempt under the ECPA's "party exception," and second, it claims the information transmitted to Meta is not "content" under the statute. *See* Def's MTD at 6, 7. Both of these arguments misstate the gravamen of Plaintiff's allegations under the ECPA: that serious, personal information was transmitted to a *non-party*, Meta, through U.S. Bank's actions. These allegations are sufficient to state a claim under the ECPA.

Indeed, Plaintiff's FAC sufficiently alleges that U.S. Bank did more than merely *receive* Plaintiff's communications. U.S. Bank deliberately installed the Meta Pixel on its website. It enabled Meta—a third party with no functional role in the underlying transaction—to unlawfully intercept communications containing personally identifiable financial information submitted by consumers during onboarding for credit cards and other

financial products. *See* FAC ¶ 218. Defendant intentionally used the wire or electronic communications for its own business purposes, unrelated to the transactions between Plaintiff, Class members, and Defendant. It specifically used the Pixel to track and utilize Plaintiff's and Class Members' Private Information for its own gain. This conduct violates the ECPA. *See Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916, 924 (D. Minn. 2024) (holding that "[a] plaintiff pleads a prima facie case under [ECPA] by showing that the defendant (1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication, (5) using a device.").

The ECPA defines interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8). *See* FAC ¶ 218.

Faced with Plaintiff's well-pleaded FAC, Defendant seeks to invoke the "party exception" to the ECPA, which permits "a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception." *See* 18 U.S.C. § 2511(2)(d); *see also* Def's MTD at 6. True, Defendant is a "party to the communication" concerning the communications. However, Defendant's simultaneous duplication, forwarding, and interception of Plaintiff's and Class Members' PIFI – all to transmit to a non-party, *unknown* to Plaintiff at the time of transmission – does not qualify for the party exemption. *See* FAC ¶¶ 129, 180. Defendant was not acting under the color

of law to intercept Plaintiff's and Class Members' wire or electronic communication. *Id.* ¶¶ 226-227; *See also, Shah v. Capital One Fin. Corp.*, 24-CV-05985-TLT, 2025 WL 714252 (N.D. Cal. Mar. 3, 2025) (customers' ECPA claim against credit card companies disclosing personal and financial information to outside parties through web tracking technologies not barred by "party exception").

Defendant also cites *Okash v. Essentia Health, No. 23-482,* 2024 WL 1285779 (D. Minn. Mar. 26, 2024) to support its party exception argument, but that case is inapposite. There, the court addressed passive website analytics, whereas here, U.S. Bank actively duplicated and redirected sensitive financial data to Meta without consent. *See* FAC ¶ 129. Indeed, Meta is *not* a party, and U.S. Bank is the bad actor allowing this to happen, with whom Plaintiff is correct in seeking recourse. *See, e.g., Shah*, *supra.*

Equally, "[t]he party exception does not apply where the interceptor acts 'for the purpose of' committing any crime or tort in violation of state or federal law." *In re Grp. Health Plan Litig.*, 709 F.Supp.3d 707, 719 (D. Minn. 2023) (citing 18 U.S.C. § 2511(2)(d)). "The existence of a lawful purpose does not sanitize an interception that was also made for an illegitimate purpose." *Id.* (citing *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 796 (N.D. Cal. 2022)). Importantly, "this district has not found that the crime-tort exception to the Wiretap Act is inapplicable where the defendant's primary motivation was to make money." *Id.* at 720.

*In re Group Health Plan Litigation* is instructive. At issue was HealthPartners' use of the Pixel to share patient information with Meta. *In re Grp. Health Plan Litig.*, 709 F.Supp.3d at 712. The court found the crime-tort exception applied where the plaintiffs

"allege[d] the primary motivation in HealthPartners' interception and disclosure was to commit wrongful and tortious acts, 'namely, the use of patient data for advertising in the absence of express written consent,' and the use 'for marketing and revenue generation was in violation of HIPAA and an invasion of privacy.'" *Id.* Plaintiff makes a similar allegation here that the purpose of the Meta pixel was "invading Plaintiff's privacy." FAC ¶ 228; *see also* ¶ 229 (identifying a violation of FIPA).

As in *In re Group Health Plan Litigation*, here, "[t]here is a not-insignificant chance, then, that plaintiffs may be able to show that the crime-tort exception applies," and therefore, the claim is viable. *In re Grp. Health Plan Litig.*, 709 F.Supp.3d at 720 (citing *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021) ("finding the crime-tort exception may apply where plaintiffs 'adequately alleged that Google's association of their data with preexisting user profiles violated state law, including ... intrusion upon seclusion, and invasion of privacy'").

Defendant's argument that the personally identifiable financial information surreptitiously recorded and sent to Meta was not "content" also misstates what was being transmitted. *See* Def's MTD at 7. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added). FAC ¶ 114. "It is also a violation of the ECPA to use the contents of a communication that a person knows was unlawfully intercepted." *Mekhail*, 726 F. Supp. 3d 916 at 924. Defendant has admitted that the information at issue includes "name, postal address, email address, telephone number, Social Security number, date of birth or account information."

*See* Privacy Policy. This information goes beyond mere metadata or device characteristics; it reflects the substance and meaning of Plaintiff's and Class members' communications with U.S. Bank. It includes information necessary to receive credit card applications and loans, the valuable information often traded in nefarious circles for cash and fought over by big companies for their own monetization aims, Meta included. Therefore, transmitting Plaintiff's PIFI to the U.S. Bank Website qualifies as a substantive "communication" under the ECPA's definition in 18 U.S.C. § 2510(2). *Id*. ¶112.

By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to affiliates and other third parties while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c). *Id* ¶ 121. Accordingly, Defendant's motion to dismiss Plaintiff's ECPA claim should be denied.

## III. Plaintiff's UCL Claims Are Viable

### A. Plaintiff Lost Money and Therefore, Has Statutory Standing Under the UCL.

"In order to establish standing under the UCL, as amended by California Proposition 64, a plaintiff must demonstrate that he has 'suffered injury in fact and has lost money or property as a result of the unfair competition.'" *Sequeria v. U.S. Dept. of Homeland Sec.*, 722 F.Supp.3d 996, 1008 (N.D. Cal. 2024) (quoting Cal. Bus. Prof. Code § 17204).

> In other words, "a plaintiff must demonstrate some form of economic injury[,]" such as if he "(1) surrender[ed] in a transaction more, or acquire[d] in a transaction less, than he or she otherwise would have; (2) ha[d] a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a

> transaction, costing money or property, that would otherwise have been unnecessary."

*Sequeria*, 722 F.Supp.3d at 1008 (quoting *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 323 (Cal. 2011)).

The decision in *Sequeria* is highly instructive. Three plaintiffs brought a class action against the "Federal Government Defendants," which included the Department of Homeland Security and Immigration and Customs Enforcement, and the "Money Transfer Defendants," which included Western Union and several other financial institutions. *Sequeria*, 722 F.Supp.3d at 1000. At issue was the fact that the plaintiffs' financial records were collected and shared through the Transaction Record Analysis Center ("TRAC"), a collaboration of law enforcement agencies. *Id.* Specifically, "TRAC gathers and makes available consumer financial records from money transfer companies for money transfers greater than $500 sent to or from the Southwest border region, including Arizona, California, New Mexico, Texas, and Mexico." *Id.*

The plaintiffs brought multiple claims against the Money Transfer Defendants, including violation of FIPA via the UCL. *Id.* at 1007. Like U.S. Bank, the Money Transfer Defendants challenged the plaintiffs' statutory standing under the UCL. In rejecting this argument, the *Sequeria* court stated, "Plaintiffs Sequeira and Cordero satisfy that burden by alleging that, had they known of Western Union's alleged violations of the Cal. FIPA, they 'would not have paid Western Union to process the transaction[s], and would instead have searched for alternative ways of sending [their] money.'" *Id.* at 1008.

The same is true here. Plaintiff has been a customer of U.S. Bank for years. FAC ¶¶ 13, 63, 194. In that time, he has been forced to pay multiple fees to U.S. Bank for various transactions. *Id.* Had he known that U.S. Bank was transferring his financial information to Meta via the Pixel, he would not have continued to bank with U.S. Bank and instead would have searched for alternative banks. *Id.* ¶ 76. As such, he has lost money sufficient to establish statutory standing under the UCL.

Defendant's cases do not hold otherwise. To the contrary, in *Low v. Linkedin Corp.*, the court held that one of the plaintiffs met the lost money or property threshold where he paid $24.99 to the defendant. *See Low*, 900 F.Supp.2d 1010, 1026 (N.D. Cal. 2012).

U.S. Bank argues that Plaintiff's use of the UCL is a "procedural loophole," but this is entirely wrong. "[T]he California Supreme Court has made clear that a predicate statute need not itself be independently actionable for a plaintiff to bring a claim under the UCL's unlawful prong." *Id.* Contrary to U.S. Bank's argument, nothing "'prohibits an action under the UCL merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct.'" *Id.* (quoting *Cel-Tech Commc'ns Inc. v. Los Angeles Cellular Tel. Co*., 20 Cal. 4th 163, 182 (Cal. 1999)). Thus, while neither FIPA nor the GLBA have private rights of action, both are enforceable via the UCL.

**B. The Privacy Policies Do Not Provide Clear and Conspicuous Notice.**

U.S. Bank argues incorrectly that it provides notice of the information it collects through its privacy policies.[2] Def. Mem. at 13-14. However, it sidesteps right past a critical

[2] Notably, this argument only applies to the GLBA. Per FIPA, the financial institution must obtain a signed consent form to share a customer's information. *See* FAC ¶ 115, citing Cal.

element of that notice, namely, that it be clear and conspicuous. *See* 15 U.S.C. § 6803(a). As Plaintiff details in the Amended Complaint, the regulations have defined "clear and conspicuous" to mean "that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." *See* FAC ¶ 150 (quoting 16 C.F.R. § 313.3(b)(1)).

Per the regulations, when the financial institution

> provide[s] a notice on a web page, you design your notice to call attention to the nature and significance of the information in it if you use text or visual cues to encourage scrolling down the page if necessary to view the entire notice and ensure that other elements on the web site (such as text, graphics, hyperlinks, or sound) do not distract attention from the notice, and you either:
>
> > (A) Place the notice on a screen that consumers frequently access, such as a page on which transactions are conducted; or
> >
> > (B) Place a link on a screen that consumers frequently access, such as a page on which transactions are conducted, that connects directly to the notice and is labeled appropriately to convey the importance, nature and relevance of the notice.

16 C.F.R. § 313.3(b)(2)(iii).

There is no evidence in the record that U.S. Bank's link meets any of these requirements. To the contrary, per the allegations in the Amended Complaint—which must be taken as true—while Defendant provides a link to the website Privacy Policy, that link simply states what it is but fails "to convey the importance, nature and relevance of the notice." Nor are there any "text or visual cues to encourage scrolling down the page," while

---

Fin. Code § 4053(a)(2)(B). Neither the Privacy Policy nor the California Privacy Center policy were ever ***signed*** by Plaintiff or the California Subclass members. *See* FAC ¶ 118. And U.S. Bank does not claim otherwise. At this stage it must be taken as true, and as such, the Privacy Policy and the California Privacy Center policy cannot constitute sufficient notice under FIPA.

"other elements on the website (such as text, graphics, hyperlinks, or sound) . . . distract attention from the notice." As such, it does not constitute clear and conspicuous notice. FAC ¶ 154.

The regulations are even more specific. Per the GLBA regulations, "[e]xamples of reasonable expectation of actual notice. You may reasonably expect that a consumer will receive actual notice if you: . . . (iii) For the consumer who conducts transactions electronically, clearly and conspicuously post the notice on the electronic site *and require the consumer to acknowledge receipt of the notice* as a necessary step to obtaining a particular financial product or service[.]" (emphasis added). U.S. Bank provides not evidence that consumers ever "acknowledge receipt of the notice." 16 C.F.R. § 313.9(b)(1). The regulations make clear that merely publishing its notice is insufficient: "Examples of unreasonable expectation of actual notice. You may not, however, reasonably expect that a consumer will receive actual notice of your privacy policies and practices if you: (i) Only post a sign in your branch or office or generally publish advertisements of your privacy policies and practices." 16 C.F.R. § 313.9(b)(2).

Equally fatal is that to be "clear and conspicuous," the notice must be "reasonably understandable." *See* FAC ¶ 150 (quoting 16 C.F.R. § 313.3(b)(1) ). Examples of the notice being "reasonably understandable" include "[a]voiding explanations that are imprecise and readily subject to different interpretations." *Id.* ¶ 151 (quoting 16 C.F.R. § 313.3(b)(2)(F)).

Both the Privacy Policy and the California Privacy Center policy use explanations that are imprecise and readily subject to different interpretations. Such phrases include, but are not limited to, "advertising efforts," "certain email communications," and "to another

party." These phrases are imprecise. For example, the phrase "to another party" does not identify which party, such as Meta. Likewise, "certain email communications" does not state which email communications. The phrase "advertising efforts" does not explain what the "advertising efforts" are. These are just a few of the many instances of imprecise language used in the policies. FAC ¶ 152.

## IV. Plaintiff Has Adequately Stated a Claim Under the California Consumer Privacy Act (CCPA), Cal. Civ. Code § 1798.150

Defendant argues that Plaintiff's CCPA claim fails because (1) the information disclosed does not meet the statute's definition of "personal information," and (2) there was no "unauthorized access" due to inadequate security. *See* Def's MTD at 15-17. Both arguments are unavailing and contradicted by the statute's clear language and U.S. Bank's own admissions.

Per the CCPA,

> "Personal information" means information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household. Personal information includes, but is not limited to, the following if it identifies, relates to, describes, is reasonably capable of being associated with, or could be reasonably linked, directly or indirectly, with a particular consumer or household:
>
> > (A) Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.
> >
> > (B) Any personal information described in subdivision (e) of Section 1798.80.
> >
> > (C) Characteristics of protected classifications under California or federal law.

> (D) Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.
>
> (E) Biometric information.
>
> (F) Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an internet website application, or advertisement.
>
> (G) Geolocation data.
>
> (H) Audio, electronic, visual, thermal, olfactory, or similar information.
>
> (I) Professional or employment-related information.
>
> (J) Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (20 U.S.C. Sec. 1232g; 34 C.F.R. Part 99).
>
> (K) Inferences drawn from any of the information identified in this subdivision to create a profile about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.
>
> (L) Sensitive personal information.

Cal. Civ. Code ¶§ 1798.140.

According to U.S. Bank, it collects nearly every category of information, even using the same titles. *See* California Privacy Center policy ("Categories of personal information we collect"). For example, it claims to collect "Identifies", including, "[a] real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, Social Security number, driver's license number, passport number, signature or other similar identifiers. *See* California Privacy Center policy ("Categories of

personal information we collect").

This tracks with Plaintiff's allegations that U.S. Bank disclosed his PIFI, including names, browser and Facebook identifiers, IP addresses, and sensitive onboarding data for financial products. *See* FAC ¶¶ 7–11, 25–34, 168-169.

Further, Plaintiff alleges that this sensitive information was not encrypted and was automatically transmitted to Meta through the Meta Pixel, enabling Meta to identify Plaintiff and serve targeted ads based on his financial activity. *See* FAC ¶¶ 30–32, 69–71.

U.S. Bank also argues that Plaintiff has not alleged a "breach" or failure of security procedures— which is incorrect in light of case law. Def's MTD at 16. In *Doe v. MKS Instruments, Inc.*, the court held that "plaintiffs plausibly alleged the defendant failed to maintain reasonable security procedures and practices when there were sufficient allegations that unauthorized parties were able to access the plaintiffs' personal information." *Doe*, 2023 WL 9421115, *10 (C.D. Cal. Nov. 3, 2023).

Here, U.S. Bank's use of the Meta Pixel constituted a failure to implement reasonable security procedures to protect customer data. *See* FAC ¶¶ 33–34, 168–170. Rather than securing Plaintiff's data, U.S. Bank intentionally embedded tracking tools that transmitted it to an unrelated third party (Meta) without disclosing, encryption, or meaningful customer consent required under the CCPA. *See Id.* ¶¶ 25–30, 168–173. As alleged in the Complaint, "U.S. Bank could easily program its website so that this information is not disclosed to Facebook," yet it knowingly chose not to—demonstrating a deliberate design decision that allowed the unauthorized disclosure of personally identifiable financial information. *See Id.* ¶ 33.

Moreover, the CCPA requires that "[a] business that collects a consumer's personal information shall implement reasonable security procedures and practices appropriate to the nature of the personal information to protect the personal information from unauthorized or illegal access, destruction, use, modification, or ***disclosure*** in accordance with Section 1798.81.5." Cal. Civ. Code § 1798.100(e). FIPA is explicit, "a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates." Cal. Fin. Code § 4052.5. By including a Meta Pixel, U.S. Bank failed to implement reasonable security procedures to prevent a disclosure made illegal under FIPA; to the contrary, it facilitated it. This constitutes a breach under the CCPA.

Plaintiff has sufficiently alleged that U.S. Bank disclosed personal information, so Defendant's motion to dismiss the CCPA claim should be denied.

## V. Plaintiff Has Properly Stated a Claim for Invasion of Privacy Under California Law

Defendant next contends that Plaintiff fails to state a claim for invasion of privacy because the alleged conduct was not sufficiently "offensive" or invasive to rise to a constitutional or common-law violation. Def. Mem. at 18-19. This argument fails. To state a claim for invasion of privacy, "[p]laintiffs must show that (1) they possess a legally protected privacy interest, (2) they maintain a reasonable expectation of privacy, and (3) the intrusion is so serious as to constitute an egregious breach of the social norms such that the breach is highly offensive." *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 888 (C.D. Cal.

2024). Moreover, "[i]n determining whether invasion of privacy interest was highly offensive under California law, as required to establish claim for invasion of privacy and intrusion upon seclusion, courts may consider degree of intrusion, context, conduct, and circumstances surrounding intrusion as well as intruder's motives and objectives, setting into which he intrudes, and expectations of those whose privacy is invaded." *In re Meta Pixel Healthcare Litig.*, 647 F.Supp.3d 778 (N.D. Cal. 2022).

U.S. Bank argues that passing the financial information does not constitute an intrusion nor is it highly offensive. Defendant claims there was no intrusion because Plaintiff voluntarily browsed the website. However, courts have rejected this notion. In *R.C. v. Walgreens Co*, for example, the court stated:

> The Court is thus unpersuaded that "California courts have rejected this type of claim" merely because the alleged invasion occurred as a result of Plaintiffs' activities on a public website. (See Motion at 11.). The case law does not support that bright line rule. See, e.g., *Cousin v. Sharp Healthcare*, 702 F.Supp.3d 967, 973 (S.D. Cal. Nov. 17, 2023) ("Cousin II") (finding that plaintiffs' "interactions on Defendant's website, while 'unauthenticated' or publicly facing, plausibly involve" protected health information sufficient to plead invasion of privacy claims); *In re Meta Healthcare Pixel Litig.*, 2024 WL 333883, at *3 (N.D. Cal. Jan. 29, 2024) ("Plaintiffs' privacy claims are not foreclosed at this juncture in whole or part simply because their communications with their healthcare providers may have been through publicly available webpages.").

Equally, the *In re Group Health Plan Litigation* decision is on all fours. There, the defendant also argued that the plaintiffs failed to "pled 'intrusion' and 'highly offensive' conduct." *In re Grp. Health Plan Litig.*, 709 F.Supp.3d at 714. However, the court disagreed, noting:

> Plaintiffs have sufficiently alleged both. They claim HealthPartners deliberately integrated Facebook Pixel and CAPI into its Website and servers

> (Compl. ¶¶ 31, 110, 175), which intercepted and shared communications with third parties, including Facebook. (*Id.* ¶¶ 126, 110, 141.) At this stage, these facts are considered in the light most favorable to Plaintiffs and are suggestive of intentional intrusion by HealthPartners.
>
> Furthermore, Plaintiffs must demonstrate that such intrusion would be highly offensive to a reasonable person. Plaintiffs describe the interference as intentional and involving sensitive health information, including communications about medical records and diagnoses. (Compl. ¶¶ 20, 22, 27, 31, 41, 51, 73, 95, 110, 119, 148, 150). This goes beyond the kind of non-descript, vanilla, browsing history that HealthPartners suggests Plaintiffs have pled. The case *Cousin v. Sharp Healthcare* supports this, where similar disclosures were deemed "highly offensive." 681 F.Supp.3d 1117, 1126–27 (S.D. Cal. 2023). Thus, Plaintiffs plausibly allege HealthPartners' actions as highly offensive to a reasonable person.

*Id.*

Like the health information in *R.C.* and *In re Group Health Plan Litigation*, the financial information submitted on a bank's website—especially when applying for credit cards and other financial products—is among the most sensitive and legally protected forms of personal information. *See* FAC ¶ 178. California's enactment of FIPA reinforces this by providing extra protection to such information specifically. In passing the FIPA, the legislature declared, "[t]he California Constitution protects the privacy of California citizens from unwarranted intrusions into their private and personal lives." Cal. Fin. Code § 4051.5(a)(1). In so doing, California legislators tied this financial information to the California Constitution's right to privacy. The legislature further stated its intent in passing FIPA was, in part, "[t]o achieve that control for California consumers by requiring that financial institutions that want to share information with third parties and unrelated companies seek and acquire the affirmative consent of California consumers prior to sharing the information." *Id.* (b)(2).

Plaintiff further alleges that he submitted such information on U.S. Bank's website, believing it would be used solely for financial purposes and remain confidential. *See* FAC ¶¶ 65–67, 172–174. The unauthorized, undisclosed sharing of sensitive financial application data with a third-party marketing platform like Meta—via an embedded tracker designed to monitor user behavior—constitutes an egregious invasion. Defendant's unauthorized disclosure of Plaintiff's and Class Members' PIFI to Meta, a third-party social media and marketing giant, is highly offensive to a reasonable person, including Plaintiff and Class Members. *Id*. ¶¶ 28–30, 68–74, 177–178. Additionally, Plaintiff alleges that he began receiving targeted ads shortly after applying for financial products, demonstrating that the intercepted data was both sensitive and actively exploited for commercial gain. *Id*. ¶¶ 70–72. This concrete harm reinforces the offensiveness of the intrusion. Accordingly, Defendant's motion to dismiss should be denied.

**VI. Plaintiff Has Pled a Breach of Implied Contract Claim**

As the name suggests, "[a]n implied-in-fact contract is a contract inferred from the circumstances and conduct of the parties." *In re Grp. Health Plan Litig.*, 709 F.Supp.3d at 714. "To state a claim for breach of contract under Minnesota law, a plaintiff must allege facts showing (1) that a contract was formed, (2) the plaintiff performed any conditions precedent, (3) the defendant materially breached the contract, and (4) damages." *Id.* (citing *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 703 F.3d 1104, 1107 (8th Cir. 2013)). Defendant challenges the first and fourth elements. *See* Def. Mem. at 20-21.

Once again, *In re Group Health Plan Litigation* is highly instructive. In denying the motion to dismiss the breach of implied contract claim, the court provided the following

analysis:

> Plaintiffs assert that when they provided their private information to HealthPartners through their Website to receive services, "they entered into an implied contract" with HealthPartners by which HealthPartners "agreed to safeguard and not disclose their Private Information without consent." (Compl. ¶¶ 281–82.) To support this allegation, Plaintiffs point to HealthPartners' "several privacy policies that represent to patients and Website visitors that Defendant will keep sensitive information confidential and will only disclose Private Information under certain circumstances, none of which apply here." (*Id.* ¶ 193; see also id. ¶ 194.) Plaintiffs specifically allege that HealthPartners' Privacy Policy "does not permit Defendant to intercept, transmit, and/or disclose" their private information to third parties "for marketing purposes." (*Id.* ¶ 195.) The Policy also acknowledges that HealthPartners "is required by law to maintain the confidentiality of Plaintiffs' and Class Members' Private Information" unless a specific exception applies. (*Id.* ¶ 196.)
>
> Plaintiffs allege HealthPartners breached their implied contract by disclosing their private information "without consent to third parties like Facebook," and because of the breaches, Plaintiffs "sustained damages" in the form of "the loss of the benefit of their bargain and diminution in value of Private Information." (*Id.* ¶¶ 285–86.) Plaintiffs allege that their Private Information had financial value. (Compl. ¶¶ 232–35.)

*In re Grp. Health Plan Litig.*, 709 F.Supp.3d at 714-15.

As the table below shows, the allegations here mirror those of *In re Group Health Plan Litigation*:

| *In re Group Health Plan Litigation* | *Butler v. U.S. Bancorp* |
|---|---|
| "they entered into an implied contract" with HealthPartners by which HealthPartners "agreed to safeguard and not disclose their Private Information without consent." (Compl. ¶¶ 281–82.) | "When Plaintiff and Class Members provided their PIFI to Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their PIFI without consent." FAC ¶ 195. |
| Plaintiffs point to HealthPartners' "several privacy policies that represent to patients and Website visitors that Defendant will keep sensitive information confidential and will only disclose Private Information | "In fact, U.S. Bank's notice to consumers regarding its data sharing states critically that "The Services [referring the U.S. Bank's mobile applications, its website, and "Application we have placed on third |

| | |
|---|---|
| under certain circumstances, none of which apply here." (*Id.* ¶ 193; see also id. ¶ 194.) | party sites such as Facebook®, Twitter ®, and other social media services"] do not use cookies that capture unencrypted personal information about you." FAC ¶ 52.<br><br>"This implied contract is created, in part, by Defendant's Privacy Policies, which at all relevant times include representations that Defendant will not intercept sensitive communications for financial gain." *Id.* ¶ 196<br><br>"Defendant states in its Privacy Policy, indicative but not wholly governing of the implied contract between the parties: [citation omitted]" *Id.* ¶ 197 |
| Plaintiffs specifically allege that HealthPartners' Privacy Policy "does not permit Defendant to intercept, transmit, and/or disclose" their private information to third parties "for marketing purposes." (*Id.* ¶ 195.) Plaintiffs specifically allege that HealthPartners' Privacy Policy "does not permit Defendant to intercept, transmit, and/or disclose" their private information to third parties "for marketing purposes." (*Id.* ¶ 195.) | "Notably, Defendant's Privacy Policy does not permit it to intercept, transmit, and/or disclose their sensitive financial and private information for marketing purposes." FAC ¶ 198. |
| Plaintiffs allege HealthPartners breached their implied contract by disclosing their private information "without consent to third parties like Facebook," and because of the breaches, Plaintiffs "sustained damages" in the form of "the loss of the benefit of their bargain and diminution in value of Private Information." (*Id.* ¶¶ 285–86.) | "Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' PIFI without consent to third parties like Meta." FAC ¶ 201.<br><br>"As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged in this Complaint, including, but not limited to, the loss of the benefit of their bargain and diminution in value of PIFI." *Id.* ¶ 202. |

The *In re Group Health Plan Litigation* court held, "Plaintiffs' allegations are sufficient to state a claim." *Id.* In light of the nearly identical allegations here, the same result should lie.

In reaching its conclusion, *In re Group Health Plan Litigation* court cited another Meta Pixel case, *Doe v. Regents of University of California*. *See Doe*, 672 F.Supp.3d 813, 815 (N.D. Cal. 2023). In addressing the implied contract claim, the *Doe* court provided the following analysis:

> Plaintiff alleges that she and other class members paid money and provided their User Data to UC Regents in exchange for services, and that she and class members would not have entrusted UC Regents with their User Data in the absence of an implied contract obligating UC Regents to safeguard that data. She states that UC Regents breached this implied contract by disclosing that information to Meta, a third party. She contends that she would not have paid, or would have paid less, for these services had she known that UCSF would disclose her data.

*Id.* at 821.

The *Doe* court held that "[i]t is plausible that the parties entered into an implied contract by their actions. The agreed upon terms of this implied contract are those spelled out in the Notice of Privacy and Privacy Statement, providing assurances." *Id.*

Like *In re Group Health Plan Litigation*, the allegations here match those of *Doe*. *See* FAC ¶¶ 194, 199-202. Moreover, while *Doe* ultimately dismissed the claim on grounds unique to the university and not at issue here, the analysis of the formation of the implied contract is highly instructive.

Equally instructive is the decision in *Hall v. Centerspace, LP*, which arose from a data breach by an employer. *Hall*, 2023 WL 3435100, at *1 (D. Minn. May 12, 2023). Just

as U.S. Bank does here, the *Hall* defendant argued that no implied contract was formed to protect the plaintiff's data. *Id.* at *5. But the *Hall* court disagreed, noting,

> Mr. Hall asserts that he was an employee of IRET, a Centerspace subsidiary or predecessor, and to obtain and maintain employment, Centerspace required Mr. Hall to provide his PII to the company. Centerspace also allegedly implicitly "agreed it would safeguard the data according to its internal policies and state and federal law."

*Id.*

The *Hall* court also "agree[d] with courts that have declined to rely on *Longenecker-Wells*'s reasoning because the facts alleged in complaints like Mr. Hall's permit the reasonable inference that requiring someone to provide a Social Security number and other sensitive personal information as part of a transaction carries with it the recipient's implied agreement to reasonably safeguard it." *Id.*

Among the information that U.S. Bank admits to collecting are Social Security numbers. *See* California Privacy Center policy ("We may collect the following categories of personal information when you engage our Services: . . . <u>Identifiers</u> — A real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, ***Social Security number***, driver's license number, passport number, signature or other similar identifiers). While the full extent of the information it has collected and shared with Meta is known only to U.S. Bank, from what they have said publicly, it is of such a nature that the "transaction carries with it the recipient's implied agreement to reasonably safeguard it." *Hall*, 2023 WL 3435100, at *5.

As to the issue of damages, U.S. Bank fails to grapple with the benefit of the bargain that was lost, namely, "compensation for their financial services." *See* FAC ¶ 194.

Moreover, the damages allegations mirror those found to be sufficient in *In re Group Health Plan Litigation*, and thus, the same result should lie.

Importantly, "[a]rguments about whether Plaintiffs and HealthPartners had a meeting of the minds or debates over the value of Plaintiffs' loss are fact disputes better left for summary judgment or trial." *In re Grp. Health Plan Litig.*, 709 F.Supp.3d at 715.

## VII. Plaintiff's Unjust Enrichment Claim Should Proceed

U.S. Bank argues that there is no claim "labeled 'unjust enrichment'" under California law, and therefore it must be dismissed. However, the argument is specious. While it is true that the *Sepanossian v. National Ready Mix Company, Inc*. decision stated there is no cause of action ***labeled*** as "unjust enrichment," the court almost immediately recognized that such a cause of action can exist, but it is merely labeled as "quasi-contract." *See Sepanossian*, (2023), 97 Cal.App.5th 192, 207 ("Common law principles of restitution require a party to return a benefit when the retention of such benefit would unjustly enrich the recipient; a typical cause of action involving such remedy is 'quasi-contract'"); *see also ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016) ("While California case law appears unsettled on the availability of such a cause of action, this Circuit has construed the common law to allow an unjust enrichment cause of action through quasi-contract"). That the claim may be mistitled is not grounds for dismissing it; the court should construe it as a quasi-contract. *See Rutherford Holdings, LLC v. Plaza Del Rey*, (2014) 223 Cal.App.4th 221, 231 (when cause of action was labeled as unjust enrichment, "we will construe the cause of action as a quasi-contract claim seeking restitution"); *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (same).

U.S. Bank next argues that the claim must be dismissed under Minnesota law because it rises and falls with Plaintiff's implied contract claim. But this argument is too simplistic and fails.

In *Caldas v. Affordable Granite & Stone, Inc.*, the Minnesota Supreme Court stated, "a claimant must establish an implied-in-law or quasi-contract in which the defendant received a benefit of value that unjustly enriched the defendant in a manner that is illegal or unlawful." *Caldas*, 820 N.W.2d 826, 838 (Minn. 2012). However, the statement was in response to the principle that unjust enrichment "does not apply when there is an enforceable contract that is applicable." *Id.*

The elements of a claim for unjust enrichment differ from those of breach of implied contract. *Compare In re Grp. Health Plan Litig.*, 709 F.Supp.3d at 712 (breach of implied contract claim requires "(1) that a contract was formed, (2) the plaintiff performed any conditions precedent, (3) the defendant materially breached the contract, and (4) damages") *with id.* at 715 (unjust enrichment requires "(1) a benefit conferred; (2) the defendant's appreciation and knowing acceptance of the benefit; and (3) the defendant's acceptance and retention of the benefit under such circumstances that it would be inequitable for him to retain it without paying for it"). Thus, the two do not rise and fall in unison but instead must be analyzed as separate causes of action.

In determining whether Plaintiff adequately pled an unjust enrichment claim, the *In re Group Health Plan Litigation* decision is again highly instructive. The court denied the motion to dismiss the unjust enrichment claim:

> Plaintiffs allege they "conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiffs and Class Members, without authorization and proper compensation." (Compl. ¶ 290.) They allege HealthPartners "consciously collected and used this information for its own gain," and "unjustly retained those benefits ... without providing any commensurate compensation to Plaintiffs and Class Members." (*Id.* ¶¶ 290–91.) Additionally, they allege it would be "inequitable" to permit HealthPartners to retain "any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint." (*Id.* ¶ 292.)

*In re Grp. Health Plan Litig.*, 709 F.Supp.3d at 715.

Plaintiff, here, made nearly verbatim allegations. "Plaintiff and Class Members conferred a benefit upon Defendant in the form of PIFI that Defendant collected from Plaintiffs and Class Members, without authorization and proper compensation." FAC ¶ 206. "Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation." *Id.* "Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members." *Id.* ¶ 207. "It would be inequitable under unjust enrichment principles in Minnesota, California, and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint." *Id.* ¶ 208.

In short, it is unjust for U.S. Bank to profit from distributing Plaintiff's Social Security number to Meta. Because the allegations are nearly verbatim to those found to be sufficient in *In re Group Health Plan Litigation*, it cannot be said that Plaintiff failed to

state a claim. As such, the same result should lie, and the motion should be denied.

## VIII. Rule 15 Mandates that Leave to Replead Should be Given Freely

Federal Rule of Civil Procedure 15 mandates that courts "should freely give leave" to amend in the early stages of litigation "when justice so requires." Fed. R. Civ. P. 15(a)(2). Plaintiff believes his Amended Complaint sets forth plausible claims for relief; nonetheless, if the Court finds that any aspect of Plaintiff's claims is insufficiently pled, Plaintiff respectfully requests leave to amend to address the insufficiency.

## CONCLUSION

For the reasons stated above, Plaintiff respectfully requests this Court deny Defendant's motion in its entirety.

Date: April 18, 2025

Respectfully submitted,

By: */s/ Charles D. Moore*

Charles D. Moore
MN Bar No. 0396066
cmoore@reesellp.com
**REESE LLP**
121 N. Washington Ave., 2nd Floor
Minneapolis, MN 55401
Telephone: (212) 643-0500

Michael R. Reese (*pro hac vice* filed)
*mreese@reesellp.com*
**REESE LLP**
100 West 93rd Street, 16th Floor
New York, NY 10025
Telephone: (212) 643-0500

Kevin Laukaitis (*pro hac vice* forthcoming)
*klaukaitis@laukaitislaw.com*
Dan Tomascik (pro hac vice forthcoming)
*dtomascik@laukaitislaw.com*
**LAUKAITIS LAW LLC**

954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
Telephone: (215) 789-4462

*Counsel for Plaintiff*
*and the Proposed Class*

**CERTIFICATE OF COMPLIANCE**

I hereby certify pursuant to Local Rule 7.1(f)(2) that the Memorandum of Law in Support of Plaintiff's Opposition to Motion to Dismiss uses a proportionally spaced, Times New Roman typeface of 13 points and contains 8,613 words, as counted by the Microsoft Word processing system used to produce this brief.

Date: April 18, 2025

*/s/ Charles D. Moore*
Charles D. Moore