## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Christopher Butler, *individually and on behalf of all others similarly situated*,

Plaintiff,

v.

U.S. Bancorp,

Defendant.

Case No. 24-CV-03700 (JMB/SGE)

**ORDER**

---

Charles D. Moore, Reese LLP, Minneapolis, MN; Michael R. Reese (*pro hac vice*), Reese LLP, New York, NY; and Daniel Tomascik (*pro hoc vice*), Laukaitis Law LLC, San Juan, PR, for Plaintiff Christopher Butler.

Todd A. Noteboom and William Thomson, Stinson, LLP, Minneapolis, MN; and Jay T. Ramsey (*pro hoc vice*), Sheppard, Mullin, Richter & Hampton LLP, Los Angeles, CA, for Defendant U.S. Bancorp.

---

This matter is before the Court on Defendant U.S. Bancorp's (U.S. Bank) Motion to Dismiss Plaintiff Christopher Butler's First Amended Complaint (FAC). (Doc. No. 30.) For the reasons explained below, the Court grants U.S. Bank's motion and dismisses this action without prejudice for lack of standing.

### BACKGROUND

**A.      Butler Interacts with U.S. Bank's Website**

U.S. Bank is a national financial services provider with a principal place of business in Minnesota. (Doc. No. 25 [hereinafter FAC] ¶¶ 2, 14.) The allegations in this case concern U.S. Bank's website and mobile applications, such as the U.S. Bank Mobile App

(collectively, the Website), which U.S. Bank customers may use to access information about their U.S. Bank accounts. (*Id.* ¶¶ 3, 19.) Specifically, U.S. Bank allegedly elected to integrate Meta Pixel (Pixel)—a "unique string of code businesses can embed on their websites" to track real-time user activity and to obtain user data—into the Website. (*Id.* ¶¶ 19–24.) Pixel captures website-user data such as pages visited, information entered by users into product applications, how users interact with the website, how much time users spend viewing pages, and other actions. (*Id.* ¶¶ 21–28.) Pixel also transmits data to Meta/Facebook. (*Id.* ¶¶ 23, 30.) The information Pixel collects is valuable both to Meta and to the businesses like U.S. Bank who choose to integrate it into their websites. (*Id.* ¶¶ 26, 28, 40–43.) For instance, Pixel allows Meta "to build detailed profiles about a website's users as those users browse the web in order to serve targeted advertisements to those users." (*Id.* ¶ 24; *see also id.* ¶ 28.) Therefore, when a U.S. Bank consumer enters certain information on U.S. Bank's website, Pixel shares it with Meta, both for the benefit of Meta and U.S. Bank. (*Id.* ¶¶ 28, 29.)

Butler is a resident of California. (*Id.* ¶ 13.) He alleges that he has used both U.S. Bank's Website and Facebook. (*Id.* ¶¶ 13, 63.) Butler has, at some unspecified time, "previously applied for a credit card on U.S. Bank's website." (*Id.* ¶ 66.) While applying for the credit card, he inputted certain unspecified "personal information" into the Website. (*Id.* ¶ 67.) Butler alleges that he visited U.S. Bank's Website "to provide and receive personal and financial information using the same browser that he uses to log in to Facebook, including while he was logged-in to Facebook." (*Id.* ¶ 65.) Butler does not allege one way or another whether he is a current U.S. Bank account holder. Butler asserts

2

that, unbeknownst to him, Pixel shared the personal information entered into the U.S. Bank website with Meta.  (*Id.* ¶¶ 68–69, 75.)  He alleges that, shortly after filling out an application for an unspecified U.S. Bank product, "noted an uptick in targeted advertising on Facebook, specifically as it related to interest rates concerning U.S. Bank's Money Market account products." (*Id.* ¶ 70.)

### B.    This Action

In September 2024, Butler commenced this action.  (Doc. No. 1.)  In his Amended Complaint, Butler, individually and on behalf of all others similarly situated, alleges that the consumer information transmitted by U.S. Bank to Meta (via Pixel) includes information captured by multiple "cookies" that identify individual U.S. Bank customers (*id.* ¶ 30), onboarding information that is obtained by U.S. Bank when a website user begins or completes applying for one of its financial products[1] (*id.* ¶ 7), and other data[2] (*id.* ¶ 31). He alleges that this information allows Meta to link website activity to specific individuals, such that it amounts to PIFI.  (*Id.* ¶ 32.)  Butler claims that this interception of his unspecified PIFI by U.S. Bank and its transmission to Meta was a "highly offensive" intrusion, and that had he known that U.S. Bank was sharing his PIFI, he would not have interacted with their Website.  (*Id.* ¶¶ 74, 76.)

---

[1] The financial products for which Butler alleges U.S. Bank discloses onboarding information are: credit card applications, money market accounts, family planning loans, loans and credit lines, debt consolidation, home repair financing, private seller vehicle loans, and vehicle loans.  (FAC ¶ 8.)

[2] Including information identifying the customer's web browser, IP address, and browsing behavior on U.S. Bank's website.  (FAC ¶ 31.)

Butler brings seven claims on behalf of himself and a putative Nationwide Class and California Subclass, including two claims for violations of the California Unfair Competition Law (UCL), one claim for violation of the California Consumer Privacy Act (CCPA), one claim for the tort of invasion of privacy, one claim of breach of implied contract claim, one claim of unjust enrichment, and a claim under the Electronic Communications Privacy Act (ECPA), 18 U.S.C. § 2511, et seq.  (*See generally* FAC.)  He asserts that, as a result of U.S. Bank's conduct, he has been harmed in two ways: (1) certain "intangible harms" due to U.S. Bank's interception and disclosure of his "highly sensitive" PIFI (*id.* ¶ 74), and (2) economic harms for the "diminution in value of [his] PIFI" (*id.* ¶¶ 194, 202).

## DISCUSSION

U.S. Bank now moves to dismiss all of Butler's claims for lack of standing and for failure to state a claim.  Because neither of the injuries specified in the FAC are sufficient to confer standing, the Court grants the motion.

As a threshold matter, the Court observes that Article III of the United States Constitution limits federal jurisdiction to actual cases or controversies.  U.S. Const. art. III, § 2, cl. 1; *Spokeo v. Robins*, 578 U.S. 330, 337–38 (2016).  Standing is a jurisdictional prerequisite; as a result, it must be established before this Court can reach the merits of Butler's claims.  *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021); *Disability Support All. v. Heartwood Enters. LLC*, 885 F.3d 543, 547 (8th Cir. 2018); *see also* Fed. R. Civ. P. 12(h)(3) (providing that courts must dismiss any part of lawsuit over which it lacks subject matter jurisdiction).

4

When determining whether a plaintiff has sufficiently alleged standing, courts apply "the same standard [they] apply in Rule 12(b)(6) cases," accepting as true the factual allegations in the complaint and determining whether these allegations "plausibly suggest that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right." *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Mattes v. ABC Plastics, Inc.,* 323 F.3d 695, 697–98 (8th Cir. 2003)). To meet this standard, a plaintiff must clearly allege facts that establish three elements: (1) the plaintiff has suffered an injury in fact; (2) the claimed injury is "fairly traceable" to the defendant's alleged conduct; and (3) the relief sought will redress the claimed injury. *In re SuperValu, Inc.*, 870 F.3d 763, 768 (8th Cir. 2017) (quoting *Spokeo*, 578 U.S. at 338).

To plausibly plead facts that establish an injury in fact, a plaintiff must allege facts that show that the injury is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quotation omitted). "Concrete" injuries include "traditional tangible harms, such as physical harms and monetary harms," as well as "intangible harms" that are closely related to traditional harms, such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). While circuits have developed different tests since *Spokeo* and *TransUnion* for determining whether a plaintiff's injury is concrete, "these approaches all share an important feature: they look to the *specific* underlying harm experienced by the plaintiff and compare it, in detail, to a *specific* common-law tort." *Popa v. Microsoft Corp.*, 153 F.4th 784, 790–91 (9th Cir. 2025)

5

(emphasis in original); *see also Feldman v. Star Tribune Media Co. LLC*, 659 F. Supp. 3d 1006, 1014–15 (D. Minn. 2023) (comparing plaintiff's "intangible harm associated with the nonconsensual sharing of his private information" with the common law tort for invasion of privacy).

Here, Butler claims that U.S. Bank injured him in two ways.  First, Butler generally alleges intangible harm due to U.S. Bank's interception and disclosure of his "highly sensitive" PIFI.  (FAC ¶ 74.)  Second, Butler alleges economic harms for the "diminution in value of [his] PIFI."  (*Id.* ¶ 202.)  The Court addresses each claimed harm in turn.

### A.    Intangible Harms

Intangible harms may constitute concrete injuries if they bear a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 594 U.S. at 425.  Here, because Butler's alleged intangible injuries stem from U.S. Bank's disclosure of his PIFI without his knowledge or consent, the Court looks to the traditionally recognized torts of intrusion of seclusion and public disclosure of private facts, both of which require interference or disclosure of highly offensive information.  *See e.g.*, *Popa*, 153 F.4th at 791 (concluding that the plaintiff lacked Article III standing because the intangible injury stemming from the use of browser-tracking technology on a website she interacted with did not involve the kind of "embarrassing, invasive, or otherwise private" information that constitutes highly offensive information); *see also* Restatement (Second) of Torts §§ 652B, cmt. A (1977) (explaining that intrusion of seclusion "consists solely of an intentional interference with [plaintiff's] interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a

kind that would be highly offensive to a reasonable [person]"), 652D (explaining that disclosure of private facts requires disclosure of information concerning "the private life of another" that is "highly offensive to a reasonable person" and "not of legitimate concern to the public"). *Cf. Semien v. PubMatic Inc.*, No. 25-CV-03164 (SI), 2026 WL 216333, at *2, 4–5 (N.D. Cal. Jan. 27, 2026) (distinguishing *Popa* and concluding plaintiffs had Article III standing where the information included "sensitive information like health status and treatment, travel plans, political affiliation, sexual orientation, and more").

Turning to the allegations in the FAC, the Court concludes that Butler has not plausibly alleged sufficient facts to establish a concrete injury for intangible harms because the allegations concerning Butler's PIFI do not implicate specific "highly offensive" information. Butler alleges that at some point in the past, he "applied for a credit card on U.S. Bank's website" (FAC ¶ 66), but the FAC includes no allegations that U.S. Bank had integrated Pixel into its website at that time.[3] Likewise, Butler alleges he inputted "personal information" in the Website (*id.* ¶ 67), but he does not allege what information he entered[4] or that he actually completed and submitted the application.[5] Absent any

---

[3] Indeed, even in Butler's Response to the motion to dismiss, Butler conspicuously does not assert that U.S. Bank had integrated Pixel into its website prior to the date when he applied for their financial product. (*See generally* Doc. No. 22.)

[4] The Court notes that in the legal memorandum opposing the motion, Butler asserts that U.S. Bank distributed his Social Security number to Meta. (Doc. No. 41 at 30.) This allegation, however, is not included in the FAC, and the Court does not consider it.

[5] Butler also alleges that shortly after filling out "this application" he noted an "uptick in targeted advertising on Facebook, specifically as it related to interest rates concerning U.S. Bank's Money Market account products." (FAC ¶ 70.) In his Response, Butler states that this itself is a "concrete harm." (Doc. No. 41 at 23.) Setting aside that it remains unclear

specific description of what information Butler inputted, the Court cannot conclude that the harm Butler alleges reaches the level of highly offensive disclosures required for a finding of injury in fact.[6]  *See, e.g.*, *Popa*, 153 F. 4th at 791 (dismissing complaint for lack of standing because the plaintiff identified no "embarrassing, invasive, or otherwise private information" collected by the defendant); *Adams v. PSP Grp., LLC*, 691 F. Supp. 3d 1031, 1035, 1041–42 (E.D. Mo. 2023) (concluding that plaintiff lacked Article III standing in case concerning defendant's use of browser-tracking technology on website because the complaint did not "specify what information [the plaintiff] shared on the website, if any" or describe "what information she typed or entered into the website's data fields").

Moreover, other courts have found that plaintiffs who fail to specifically allege facts to establish the disclosure of highly sensitive data lacked standing to sue defendants using the same Pixel technology at issue in this case.  For example, *In re BPS Direct, LLC* involved the use of the "Facebook Tracking Pixel," which "compel[ed] a user's browser to

---

what application Butler applied for, if he applied for a single product or multiple products, and if so, when he applied for them, Butler points to no caselaw, and this Court is not aware of any, suggesting that an uptick in targeted advertisements is a concrete harm.  In fact, related caselaw suggests the opposite.  *See also Prestby v. A&A Services*, 8:24-CV-204, 2026 WL 26128, at *9 (D. Neb. Jan. 5, 2026); *Johnson v. Yuma Reg'l Med. Ctr.*, 769 F. Supp. 3d 936, 950 (D. Ariz. 2024) (holding that receiving unsolicited spam emails, messages, and calls does not constitute a cognizable injury); *McCombs v. Delta Grp. Elecs., Inc.*, 676 F. Supp. 3d 1064, 1074 (D.N.M. 2023) (collecting cases and concluding that a spike in unsolicited marketing and cyber ploys received by phone, email, and messaging applications is not an actual harm sufficient to confer standing).

[6] Without more information about what specific information Butler disclosed and when he disclosed it, the Court is also concerned that the FAC fails to plausibly plead facts to establish that the alleged harms are fairly traceable to collecting Butler's information through Pixel and not to some other source.

send cookies to Facebook when the user is visiting the [defendant's] Websites," and that the defendant then disclosed information to Facebook "so it can match visitors to their Facebook profiles." 705 F. Supp. 3d 333, 344–45 (E.D. Pa. 2023). The court found that the plaintiff's allegations did not establish standing "because they do not identify the personal information they inputted" in the defendant's website and because the disclosure of "basic contact information such as names, addresses, and phone numbers" does not establish a concrete injury in fact. *Id.* at 347, 359 & n. 169, 170 (collecting cases); *see also Price v. Converse, Inc.*, 805 F. Supp. 3d 1102, 1103–05 (C.D. Cal. 2025) (concluding that the plaintiff failed to plead a concrete injury because the allegations that tracking technology on defendant's website collected information that could "deanonymize [p]laintiff" and subjected the plaintiff to "highly personalized and universally unwanted marketing efforts" did not allege that defendant obtained or disclosed "highly sensitive" information). These cases, and Butler's allegations, are readily distinguishable from other cases in which plaintiffs have standing because their complaints include specific factual allegations that defendants captured highly offensive private information. *See e.g.*, *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 598–99 (9th Cir. 2020) (involving allegations that the defendant "gained a cradle-to-grave profile without users' consent" by capturing users' internet browsing history even after users "had logged off the social media platform" and "no matter how sensitive or personal" that browsing history was); *Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 827 (E.D. Cal. 2025) (involving allegations that defendants' use of Pixel disclosed "sensitive medical information" including the plaintiff's efforts to "research medical treatments, search for doctors, make appointments,

9

and review their medical records"); *Feldman*, 659 F. Supp. 3d at 1015 (involving allegations that the defendant's use of Pixel disclosed the plaintiff's internet "video viewing history," which "was his private concern" and the disclosure of which "would be offensive to a reasonable person"); *see also Salazar v. Paramount Global*, 133 F.4th 642, 647 (6th Cir. 2025) (involving allegations that defendant's use of Pixel disclosed his "private video-viewing history to Facebook") *cert. granted*, __ S. Ct. __, No. 25-459, 2026 WL 189831 (Jan. 26, 2026).

Based on a review of these cases, the Court concludes that the FAC does not plausibly allege facts to confer Butler with standing to sue for the his intangible harms.

### B.       Economic Harms

Butler also alleges economic harms for the "diminution in value of PIFI."  (*Id.* ¶ 202.)   However, the Court concludes that Butler also has not sufficiently pleaded economic harms to establish an Article III injury in fact for two reasons.

First, as previously discussed, Butler does not clearly allege what information he entered into the credit-card application or whether U.S. Bank had integrated Pixel into its website at the time he entered this information.  Absent such specific facts, the Court is not persuaded to adopt Butler's general legal conclusion that the unspecified information constitutes PIFI.  Similarly, absent specific factual allegations, FAC cannot establish any discernible economic value that can be diminished by the disclosure of the unspecified information.  Therefore, apart from general conclusory statements, the FAC does not plausibly plead the economic injury of diminution of value.

Second, setting aside the uncertainty around what information U.S Bank may have disclosed, the FAC also fails to plausibly allege facts to show Butler experienced an economic injury. While some courts have recognized diminution in value of personal information is an injury in fact which could give rise to standing, courts have often held that, to establish an injury in fact, the plaintiff must establish both the existence of a market for their personal information and an impairment of their ability to participate in that market. *In re Google Android Consumer Privacy Litig.*, No. 11-MD-02264 (HSW), 2013 WL 1283236, at *4 (N.D. Cal. Mar. 26, 2013) (collecting cases); *see also Pruchnicki v. Envision Healthcare Corp.*, 845 F. App'x 613 (Mem.) (9th Cir. 2021) ("[T]he mere misappropriation of personal information does not establish compensable damages." (quotation omitted)). Here, the FAC is devoid of any market information, any allegations that Butler participated or intended to participate in this market, or allegations that his PIFI has actually lost value in the market.[7]

For both of these reasons, Butler has not pleaded an injury in fact that would confer standing to sue for economic harms either.[8]

---

[7] To the extent that portions of Butler's written submission argue that he has suffered a separate economic harm through an analogy to *Sequeira v. U.S. Department of Homeland Security*, 722 F. Supp. 3d 996 (N.D. Cal. 2024), the Court concludes the allegation in the FAC are distinct from those in *Sequeira*. The plaintiff in that case alleged that "had they known of [defendant's] alleged violations . . . they would not have *paid* [defendant] to process the[ir] transactions." *Id*. at 1008 (emphasis added). By contrast, the FAC includes no allegations that Butler paid U.S. Bank any money for their financial services or to apply for any financial product.

[8] Because Butler is the only named plaintiff in this matter, and his claims will be dismissed, the Court need not reach Butler's request for certification of the putative class action. *Frank v. Gaos*, 586 U.S. 485, 492 (2019) (providing that, in putative class action, "federal

**ORDER**

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT Defendant's Motion to Dismiss (Doc. No. 30) is GRANTED WITHOUT PREJUDICE.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: March 31, 2026                                  /s/ *Jeffrey M. Bryan*
                                                       Judge Jeffrey M. Bryan
                                                       United States District Court

---

courts lack jurisdiction if no named plaintiff has standing"); *see also, e.g.*, *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 436 (8th Cir. 1999).